## Commonwealth *v.* McSorley, Appellant.

224

Argued December 8, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Carl B. Shelley* and *Harold E. McCamey*, with them *Warren G. Morgan*, and *Shelley, Reynolds & Lipsitt*, and *Dickie, McCamey, Chilcote & Robinson*, for appellant.

*Huette F. Dowling,* District Attorney, and *Thomas D. McBride,* Attorney General, with them *Mary E. Hoerner,* Assistant District Attorney, *Alfred P. Filippone,* Deputy Attorney General, *Isaiah W. Crippins,* Deputy Attorney General, and *Vincent G. Panati,* Special Assistant Attorney General, for appellee.

OPINION BY GUNTHER, J., April 16, 1959:

Defendant, G. Franklin McSorley, has appealed his conviction and sentence in the Court of Quarter Sessions of the Peace of Dauphin County for misbehavior in office. This charge grew out of an investigation of the Pennsylvania Turnpike Commission by a Grand Jury which investigation was requested by the Attorney General of Pennsylvania, alleging misconduct by various persons in the Turnpike Commission. The Attorney General's petition, however, made no reference to the defendant.

On January 18, 1957, the Grand Jury made its report and presentment in which it recommended the indictment of the defendant for malfeasance, misfeasance and nonfeasance.

On January 21, 1957, before indictment, defendant moved the court to quash that part of the presentment which involved him, assigning the reason that the presentment was not within the scope and limitations placed upon the investigation by the court. This motion was overruled and on January 23, 1957, pursuant to an order of the court below directing the district attorney to prepare indictments in accordance with the offenses charged in the presentment, the regular Grand Jury returned a true bill charging defendant with malfeasance, misfeasance and nonfeasance in office. Thereafter, a motion to quash the indictment was presented on the grounds that the presentment, upon which the indictment was based, was not within the authority

of the investigating Grand Jury; that remarks concerning the case made by the Governor on radio and television just prior to the convening of said body were prejudicial, and that the prosecuting officers improperly participated in its deliberations and erroneously advised the special Grand Jury. This motion was denied.

From such action an appeal was filed to this Court and on March 18, 1957, after argument, we quashed the appeal for the reason that the order of the Court of Quarter Sessions of Dauphin County dismissing defendant's petition was interlocutory and not appealable.

On November 12, 1957, the defendant was brought to trial and at the conclusion of the Commonwealth's evidence, the defendant's demurrer was overruled. A point for binding instructions was likewise refused and the jury returned a verdict of guilty. Motions for new trial and in arrest of judgment were made and refused and the defendant sentenced. This appeal followed.

Two questions are raised for our consideration: (1) Under the Act of June 15, 1951, P. L. 585, 19 P.S. Section 871, should the motion in arrest of judgment, because of insufficiency of evidence to sustain the conviction, have been granted; and (2) should the presentment of the investigating Grand Jury and the indictment subsequently found thereon be quashed? As our disposition of the first question effectively disposes of this appeal, we shall not consider the second question.

The Act of June 15, 1951, P. L. 585, supra,[1] imposes upon the court the duty to consider the entire record

---

[1] This act is poorly drafted. It contains a duplication of the word "may". It refers to a motion on the grounds "that the evidence was insufficient to sustain the charge," and refers to the action of the court on that motion by stating, when it "shall de-

to determine whether there is sufficient evidence to establish the guilt of the defendant. The court was not given jurisdiction to pass upon the credibility of the witnesses, or to review the evidence as a fact findei, or to determine whether it would have arrived at the same verdict as the jury did. We must, therefore, reject all of the defendant's evidence which the jury had a right to disbelieve. After a verdict of guilty, we must accept as true all of the Commonwealth's evidence upon which the jury could have properly based its verdict. *Commonwealth v. Phillips*, 372 Pa. 223, 93 A. 2d 455 (1953).

The common law crime of misfeasance in office has been clearly defined by our appellate courts to mean either the breach of a positive statutory duty or the performance by a public official of a discretionary act with a corrupt motive. *Commonwealth v. Peoples et al.*, 345 Pa. 576, 28 A. 2d 792; *McNair's Petition*, 324 Pa. 48, 187 A. 498; *Commonwealth v. Hubbs (No. 2)*, 137 Pa. Superior Ct. 244, 8 A. 2d 618. Misconduct or malfeasance in office, in its penal sense, is not merely

cide that there is not sufficient evidence to sustain the conviction," it shall discharge the defendant. It was poor draftmanship to change the language from "evidence was insufficient" to "there is not sufficient evidence" and from "sustain the charge" when referring to the motion, to "sustain the conviction" when referring to the action of the court on the motion. The proper word to use was neither "charge" nor "conviction" but "verdict." The expressions "face of the record" and "entire record" in the act use the word "record" in two different meanings.

The Attorney General's message to the Governor recommending his signing this into law pointed out the errors in language, foresaw the confusion exemplified by this case, and concluded as follows: "While these words may cause confusion, we are, nevertheless, of the opinion that the bill is an improvement in criminal procedure, will expedite the work of the court, and result in fairer treatment of a defendant."

error in judgment or departure from sound discretion, but the act, omission or neglect must be wilful, corrupt and amount to a breach of duty legally required by one who has accepted public office. *Commonwealth v. Brown et al.*, 116 Pa. Superior Ct. 1, 175 A. 748.

It is conceded by all that the defendant violated no positive statutory duty in the performance of the alleged acts here involved. An examination of the Pennsylvania Turnpike Northeastern Extension Act of September 27, 1951, P. L. 1430, 36 P.S. 660 et seq., clearly discloses this to be a fact. The General Assembly has constituted the Pennsylvania Turnpike Commission as an instrumentality of the Commonwealth and, therefore, a member of the Turnpike Commission is a public officer. See Act of May 21, 1937, P. L. 774, 36 P.S. section 652(d). The Commonwealth had to prove, therefore, that the defendant performed a discretionary act with a corrupt motive. In order to sustain this conviction, the Commonwealth had the duty to prove the act complained of *and* that the defendant acted from a corrupt motive.

The facts of this case are not complicated. The defendant, a prominent businessman, with no former governmental experience, was appointed a member of the Pennsylvania Turnpike Commission. After serving a few months he replaced as chairman, T. J. Evans, who had been a member of the commission for approximately 16 years. After McSorley became chairman, Evans was not on the payroll of the turnpike or the Commonwealth. The evidence establishes that immediately after Evans was replaced as a member of the Commission, McSorley had David J. Dalto, a turnpike employe, assigned to Evans as a chauffeur for a period of 8 months at a cost to the Commission of approximately $2800 paid by it to Dalto in salary. Dalto drove exclusively for Evans, and those for whom Evans

asked him to drive. He furnished no other service to the Commission or to the Commonwealth.

Whether this act of McSorley was good practice or sound judgment is not for our consideration in this case; we are concerned with whether the act was criminal. If McSorley had a corrupt motive, it was. If this motive in assigning the chauffeur to Evans was to obtain gain for himself or his political party, or to bestow a gratuity upon a relative or a friend or a political ally at the expense of the Commonwealth, his motive would be corrupt and he would be guilty of the offense charged. The Commonwealth need not present detailed testimony to establish the motive, but evidence must be produced which discloses facts from which a corrupt motive can be inferred.

Criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt. *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A. 2d 820; *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A. 2d 743. The jury may not be permitted to guess or surmise at an evil or corrupt motive.

The Commonwealth relies on three sets of circumstances from which, it argues, an inference of corrupt motive may be deducted. First, it relies upon the fact that the defendant on three occasions between July 1, 1955 and March 1, 1956 publicly acknowledged that Dalto was performing services for Evans. This merely is evidence of the admitted fact that McSorley assigned Dalto to drive for Evans, but is no evidence of his motive or his reason for assigning the chauffeur. Next, it argues that the fact that defendant directed Dalto to perform personal services for Evans after the termination of the latter's term of office as a member of the Pennsylvania Turnpike Commission would of itself raise the inference of a corrupt motive.

Establishing by sufficient evidence the act of assigning the chauffeur to Evans for his personal use does not automatically establish the corrupt motive. The act and the motive are separate issues to be separately determined. A corrupt motive can be inferred from the act[2] only within a climate of facts which makes that inference reasonable.

The third circumstance upon which, the Commonwealth argues, a corrupt motive can be inferred, involves a "leave" granted Dalto when he became injured in an automobile accident. The evidence disclosed that on January 9, 1956, Dalto, while driving Richard Evans, the son of T. J. Evans, was involved in an automobile accident in which Richard Evans was fatally injured and Dalto received injuries requiring hospitalization.

William H. Cooper informed the defendant of the accident and suggested to him that he, Cooper, would place Dalto on sick leave. The defendant concurred in that suggestion. Thereafter, Cooper left defendant's office without any further conversation in regard to Dalto and obtained a blank leave slip which he delivered to William J. Roberts, controller for the Commission. The leave slip was filled out by Roberts and dated January 6, 1956. The leave granted Dalto, however was a one day vacation leave for January 9, 1956. Cooper testified that the slip was made out by the personnel department, whereas Roberts testified that the information was obtained from Cooper. The evidence clearly shows, therefore, that the entries made on the leave slip were prepared by persons other than the defendant.

The defendant's only connection with the leave was to acquiesce in the statement by Cooper that he would

---

[2] *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A. 2d 820; *Commonwealth v. Homeyer*, 373 Pa. 150, 94 A. 2d 743.

place Dalto on *sick leave*. The evidence did not disclose that the defendant had any knowledge that Dalto was to be granted vacation leave for January 9, 1956, or that the leave slip was to be dated back. None of these circumstances nor the inferences therefrom, either singly or collectively, show any corrupt motive.

What was the motive of the defendant in supplying Evans with a chauffeur at Turnpike expense? The Commonwealth would certainly admit that he did not do so to acquire any present or future personal financial gain. There is no evidence from which it could be concluded that the motive was political gain or reward for the defendant or his political party or political friends. (Evans was a Republican and McSorley, a Democrat). There is no evidence that McSorley and Evans were relatives or friends. (They did not know each other until McSorley was appointed to the Commission). There is no evidence from which it could be inferred that McSorley or any person or organization with which he was associated, ever received or hoped to receive any personal favor or thing of value from Evans or from any person or persons he might influence.

McSorley testified that when he became Chairman of the Commission, which was during a hundred million dollar construction program with which Evans was familiar, he was anxious to have Evans available for advice and suggestions, thus utilizing his long experience as a member and Chairman of the Commission, and that after discussing this with Evans, he gave him a chauffeur paid by the Commission so that he might be driven to Harrisburg and be willing to give information to the new chairman. The expenditure of $2800 of the Commission's money to secure advice on a hundred million dollar project from one with experience nowhere else available, negatives a finding

of criminal intent or corrupt motive.[3] There was evidence by the Commonwealth's witnesses that Evans came to the Commission offices after the chauffeur was assigned to him, and that he did consult with McSorley.

But McSorley's explanation of his motive could have been rejected by the jury, and therefore, we cannot use it to determine the defendant's motive. If there would appear in the evidence anything from which the jury could find that the defendant's motive was corrupt, we would be required to sustain the conviction. The evidence which could sustain this conviction might indicate a benefit or gain to the defendant, his political party, his relative, his friends, or the hope thereof, but there is absolutely nothing in the evidence upon which the jury could infer any such benefit or gain. Furthermore, the defendant had two distinct presumptions in his favor which had to be overcome by positive evidence. The first of these was the presumption of innocence. The presumption of innocence is a conclusion drawn by the law in favor of the accused and when he is brought to trial, he must be acquitted unless proved to be guilty beyond a reasonable doubt. This presumption does not shift and remains with the accused during the entire trial.

The second presumption, involving public officers, has been firmly established in our law. In *Matson v. Margiotti*, 371 Pa. 188, 88 A. 2d 892, the Supreme Court said that "an official act of a public official is presumed to have been performed in accordance with

---

[3] Between the time McSorley made the arrangement with Evans and the time of the trial in this case, Evans was charged and found guilty of criminal acts connected with the Turnpike. This undoubtedly had its effect upon the jury in this case, but there is no reason to believe that McSorley had any reason to question the knowledge, experience, ability and integrity of Evans at the time he succeeded him as chairman.

the law and in good faith and with the proper motive, i.e., for the purpose of promoting the public good and protecting the public interest." In *Hill v. Alexander et al.,* 338 Pa. 26, 32, 11 A. 2d 884, the Court laid down the following general principle: ". . . honesty of purpose and good faith in the performance of acts in their official capacity will be assumed by the courts on the part of persons holding responsible public positions, until the contrary clearly appears . . ." In *Barnes et al. v. Scranton Poor District,* 105 Pa. Superior Ct. 149, 160 A. 241, we said: "The presumption is that the acts of executive officers are done for public good. When their actions are challenged, the burden of showing to the contrary rests on those asserting it, and it is a heavy burden . . ." This presumption shifts if, and only if, the Commonwealth proves both elements of the crime here involved. The presumptions here involved, strongly imbedded in our law, cannot be overcome by vague references to inferences to be drawn from circumstances proved. The former is positive and the latter is negative in the sense that one must supply that which is found to be lacking.

In passing on the inferences relied on by the Commonwealth, we must point out that the inferences drawn by it could be equally drawn in favor of the defendant. In *Commonwealth v. New,* 354 Pa. 188, 221, 47 A. 2d 450, the following pointed observation was made by the Supreme Court: "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty. When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither."

The case relied upon by the Commonwealth is not applicable here to show a corrupt motive. The case of *Commonwealth v. Brownmiller*, 141 Pa. Superior Ct. 107, 14 A. 2d 907, is clearly distinguishable. In that case, the Secretary of Highways employed over 9,000 employes in Luzerne County before an election, a great majority of whom did no highway work, did not report for duty but worked in a political campaign. The motive shown there was to win an election through the padding of the payroll. The testimony revealed that Brownmiller approved a plan continuing the work in that county and signed a letter authorizing the transfer of funds to the maintenance account of Luzerne County, and that until November 7, 1938, the day before the election, the number of men had increased to more than 18,000 when 368 men normally could have manned the 734 miles of State highway.

There is nothing in the Commonwealth's case here to show that the defendant was dishonest. There was no testimony to indicate that he, his relatives, his friends, his political party, or any organization or association in which he may have been interested, were the recipient of any type of remuneration, reward or favor in return for assigning Dalto to Evans. No attempt was made to explain, as proof of a corrupt motive, why such action was taken by the defendant or to show that the Commission received no benefit from such an arrangement. While Dalto testified that during the period here involved he did no work for the Commission, if in fact Evans performed services for the Commission, the fact that Dalto drove for Mr. Evans would prove just the contrary. The testimony of a Commonwealth witness disclosed that during the first two months after Evans left the Commission, both Evans and Dalto were in Harrisburg every week for a day or so and were seen in the office of the Commis-

sion. Under these circumstances, it is difficult to understand why the Commonwealth failed to produce evidence, if it had any, to show that the Commission in fact received no benefit from the arrangement involved and to show a corrupt motive on the part of the defendant.

We are of the opinion that there is no evidence from which the jury could have inferred a corrupt motive on the part of the defendant.

The judgment of the court below is reversed and the defendant is discharged.

---

CONCURRING OPINION BY WATKINS, J.:

I concur in the majority opinion but would answer affirmatively the other question raised by this appeal. The presentment of the investigating Grand Jury and the indictment subsequently found thereon should be quashed.

The instrumentality of an investigating Grand Jury by its very nature, unless strictly and rigidly circumscribed by the Court, lends itself to persecution and abuse. Its unbridled use may well result in grave injustice.

It is well established that the authority of an investigating Grand Jury is limited by the scope of the petition which caused its impanelling. *Commonwealth v. Soloff*, 175 Pa. Superior Ct. 423, 107 A. 2d 179; *Grand Jury Investigation of Western State Penitentiary*, 173 Pa. Superior Ct. 197, 96 A. 2d 189; *In re Dauphin County Grand Jury Investigation Proceedings (No. 1)*, 332 Pa. 289, 2 A. 2d 783. An examination of the Attorney General's petition requesting the impanelling of the Grand Jury (par. 6) alleges that "members of the said Commission . . . unlawfully misbehave

themselves in public office by wilfully, knowingly and corruptly permitting the purchase of supplies and materials and the letting of contracts for materials and supplies without requiring competitive bidding . . ." The entire plan as outlined by the Attorney General was to ferret out criminal violations involving the Commission and Manu-Mine as the same related to the construction of the Northeastern Extension of the Pennsylvania Turnpike. The Attorney General reserved the right to expand and enlarge upon the scope of the Grand Jury investigation by supplemental petition or petitions but the record discloses no request to enlarge upon the scope of the investigation. Nowhere in this petition is there any allegation involving the present defendant or the subject matter presently under review. We cannot say that under this petition the investigating grand jury was empowered to examine the Turnpike Commission in every and all phases of its activity in order to determine whether any member of the Commission breached either a positive statutory duty or the negligent performance of any discretionary act, regardless of relationship to the system of crime or crimes complained of. Neither can we say that the court below conferred upon the Grand Jury any investigatory authority more sweeping or unbridled than was sought for in the Attorney General's petition. While in some states the power of the Grand Jury to investigate is virtually unlimited, we have imposed definite limitations upon its investigatorial powers. See *McNair's Petition*, 324 Pa. 48, 187 A. 498.

While the scope of its investigation is wide, the activities of the Grand Jury are restricted by the charge of the court and then under prescribed limitations. *McNair's Petition,* supra; *Commonwealth v. Hubbs (No. 1),* 137 Pa. Superior Ct. 229, 8 A. 2d 611; *Commonwealth v. Soloff,* supra. An examination of the

charge given to the Grand Jury by the court below, however, discloses that, while the charge of bribery and conspiracy were defined, no explanation or definition was given on the common law crime of malfeasance, misfeasance or nonfeasance in office. We are at a loss to explain this omission. The only possible explanation may be found in the tenor of the Attorney General's petition in which the main emphasis was placed on bribery and conspiracy. This omission set the stage for the defective presentment which was handed down in the present case. In our view, the presentment did not indicate the commission of a crime or a probable cause therefor. The presentment read as follows:

"Mr. McSorley did cause one Daniel J. Dalto, an employee of the Pennsylvania Turnpike Commission to absent himself from normal duties in order to place himself at the disposal of and for the sole use of employment of Thos. J. Evans, his guests and others at a time when Mr. Evans was no longer affiliated with the Turnpike Commission. This act was apparently committed during the period of June or July 1955 and continued through March of 1956, a period of approximately 8 months. It appears that the said Mr. Dalto was paid a sum of money in the amount of figures $2,800 by the Turnpike Commission for which the Turnpike Commission received no material or other thing of value."

Nowhere can we find that the Grand Jury found that there was reasonable cause to believe that the defendant acted from a corrupt motive. It merely stated that "In consequence of the foregoing, the members of this Special Grand Jury (with at least twelve members having voted in the affirmative) do hereby find probable cause for the following: C. The charge of the crime of malfeasance, misfeasance and nonfeasance as

applied to an officer of the Commonwealth of Pennsylvania in respect to the following: (a) G. Frank McSorley." It then followed up with the request that an indictment be drawn charging defendant with the crime of malfeasance, misfeasance and nonfeasance in that he "knowingly, wilfully and corruptly procured, permitted and allowed Daniel J. Dalto" to work for and render services to Thomas J. Evans.

It is safe to assume that the same witnesses appeared before the indicting Grand Jury as appeared before the special Grand Jury. Upon the same testimony if the investigating Grand Jury could find no probable cause, it is difficult to see how the indicting Grand Jury could have remedied that defect.

Compounding the omissions referred to were the improprieties of the prosecuting officers in being present during the deliberations of the Grand Jury, the enlargement of its investigation and the usurpation of the court's prerogative in furnishing legal instructions to it. The presentment was made on January 18, 1957. On January 16, 1957, two prosecuting officers entered the room upon the apparent request of the foreman, when, inter alia, the following colloquy took place:

"Foreman of the Grand Jury: Mr. District Attorney, Mr. Deputy Attorney General, the members of the Grand Jury would like a further explanation of the crime of malfeasance, misfeasance and nonfeasance in office by an officer of the Commonwealth."

The minutes of the Grand Jury reveal that it was the Deputy Attorney General who enlarged the scope of the investigation when he said:

"Reducing everything to the very simplest of language, as an investigating Grand Jury you have to be satisfied whether there is sufficient evidence amounting to probable cause for returning a presentment against certain individuals; and then, describe, as best

you can, what the areas are, and what you think the charges should be.

"The formulizing of all that will fall on the shoulders of the local prosecutor. Yours is informal, unofficial accusation.

"I just suggest this to you, that the best way to do it, if you find the evidence is there, is to make the presentment. If the evidence is there, to the amount of probable cause, you are discharging your duties by making a presentment. What happens from that point on is in the hands of some other tribunal, as to whether all the presentments will go ahead in the manner that you have actually set them out.

"But your duty is to look over the evidence, look and determine in your own minds whether sufficient cause to make out probable cause of a criminal act of any of the people who have been described by the various and numerous witnesses that have come before you. It is as simple as that."

From the time of Blackstone, it has always been the practice that the presiding judge must give whatever legal instructions are required. If the Grand Jury have any doubt with respect to the propriety of admitting any part of the evidence offered to them, they may request advice from the court. See 4 Blackstone Commentaries 303, 305. If the court is to instruct the Grand Jury on subjects for its consideration, it then follows that this body cannot receive instructions from any other source on questions which are to be determined by it. The Grand Jury is not the arm of the prosecuting officials but that of the court and any attempts to interfere in matters exclusively belonging to the court cannot be sanctioned.

It also appears from this colloquy that some instructions have been given previously in the Grand Jury room on the crime of malfeasance, misfeasance and non-

feasance in office. The foreman requested a *further explanation*. Considering the fact that the court below gave no instructions on this matter, the previous instruction must have come only from the prosecuting officers. To set a precedent in allowing such illegal and prejudicial practices would be tantamount to revitalizing the evils and abuses of star chamber proceedings which were so odious to our forefathers. This is a matter of serious concern which violates substantive rights of every citizen who might be subject to a presentment, indictment and subsequent prosecution for a crime. The function of the prosecuting officer is to aid the grand jurors in the examination of witnesses and to give such *general* instructions as they may require, but he may not attempt to influence their action or be present when they are deliberating on the evidence or voting on a matter under investigation. *Commonwealth v. Bradney*, 126 Pa. 199, 17 A. 600; *Commonwealth v. Brownmiller*, 141 Pa. Superior Ct. 107, 14 A. 2d 907; *Commonwealth v. Judge Smart*, 368 Pa. 630, 84 A. 2d 782.

One other irregularity crept into these proceedings. An examination of the speeches delivered by the Governor on the eve of convening the Grand Jury and the following evening disclose a disturbing interference with orderly judicial process. The speeches themselves indicate without any doubt the telling effect it had upon those who heard or saw the program. Excerpts from these speeches are set out in a footnote hereto.[1]

---

[1] Speech of October 22, 1956 made in television broadcast:

"You've seen the headlines—you'll see more. Investigation meanwhile goes on. The latest example of how the Republican leaders did business is the Turnpike scandal. A special Grand Jury is now investigating this development. We're proud of our Turnpike, justifiably so. It's one of the great highways of the world. And we have a right to be angry that anyone would use it to swin-

The stations carrying these programs admittedly had a wide coverage of Harrisburg and Dauphin County and

---

dle. Yet this has been done. Certain people set out to steal $20,-000,000 from it and they got $9,000,000 before we could stop them. Their front was a company called Manu-Mine Research and Development. Their officers were close relatives of the Chairman of the Republican Turnpike Commission—his son, his nephew and his niece by marriage. Together they owned almost all the stock in the Company. Now how did they go about getting this $9,000,000 from us.

"It was really very easy. Without competitive bidding they got a job digging holes in the ground and then filling them up again. Experts found these holes were useless and the prices charged for digging them and filling them were outrageous.

"As soon as we found out about this our Democratic Commissioners asked the Attorney General to investigate the matter. And Attorney General Cohen petitioned for a Grand Jury investigation. The investigation is now taking place.

"Now let's go back for a moment to examine exactly how Manu-Mine and its officers who knew the right Republican leaders, pulled off this swindle.

"Manu-Mine set up shop modestly with a nominal capital of $4,300 and as I told you before we stopped the deal, it had been paid over $9,000,000 by the Turnpike Commission. The secret of its success as we've seen was simple—Manu-Mine had an inside track with the Turnpike Commission and as a result it did 96.8% of its business with the Turnpike. Now, on most jobs like this one that Manu-Mine worked on, you have competitive bidding. Manu-Mine never had to bid against anybody, it never had to negotiate, it was employed as a consultant. As a consultant it recommended itself as contractor and then as an inspector of its work that it performed.

"I have here a report by Manu-Mine and the Turnpike Commission. This report cost us $117,000.00 and the gist of it was to propose a contract with—you guessed it—Manu-Mine. Now about that job. Experts say that it was unnecessary. It was made work and the price was jacked up sky-high. Now this isn't what I say or what anyone in my administration says—this is in the impartial report by the Pierce Management Company of Scranton.

"Here is the report and here is what it says:

were heard and viewed by large numbers of residents of the area. The statements of the Governor were

'In our calculations as to the reasonable unit price for drilling, we approached it from two view points. One, assumed contractor-controlled equipment. Two, assumed contractor-rented equipment. In both cases, basing the volume of drilling upon the original estimates, we allowed for overhead, a reasonable profit and the cost of casing.

With contractor-owned equipment we estimated a reasonable unit price to be $4.77 per linear foot. With rented equipment, we estimated a reasonable unit price to be $5.95 per linear foot'.

"Manu-Mine was paid $12.50 per linear foot. Now you know the story. As much of it as we know of it. You'll know more when the Grand Jury reports its finding. But the important thing to remember is this is no isolated case: that the Republican leaders have an unfortunate history of scandal that is now coming out after years of being covered up. We've only scratched the surface. We will not stop until we have made sure that the guilty have been found out and brought to justice. But more than that we will introduce a Legislative program in Harrisburg which will see to it that such dishonest and improper practices can never happen again and that's why I ask you to vote for a Democratic House of Representatives and a Democratic Senate in Harrisburg this fall so that we can pass the legislation needed to prevent dishonesty in your State Government * * *"

Statements of October 23, 1956 made in television broadcast:

Don Wear: "John Scotzin would you begin questioning Governor Leader tonight."

John Scotzin: "Governor, I caught you on a television program last night. I'm not sure what station it was—it may have been this one. It was a tailend of a political film in which you renewed all your charges about Manu-Mines of Reading fleecing the Turnpike Commission of more than $9,000,000 under Republican control. The film reminded me of a statement you made early last September when you sent Attorney General Cohen in the Dauphin County Court to ask for a Grand Jury investigation of these charges. At that time you said you were sorry to break these charges on the eve of a political campaign and that you said this wasn't a matter concerning Republicans or Democrats, that all you wanted to do was get the truth. Obviously you're out to make political hay in

quoted repeatedly by the daily press, radio and television. It would be a tenuous assumption to state

a film like you had last night. Now how do you reconcile these two divergent statements?"

Governor Leader: "Well, I think the people, John, are entitled to know the facts. And when there is conspiracy or at least an alleged conspiracy in Pennsylvania, that some group full of wilful politicians are trying to lift from the Turnpike Commission more than $9,000,000, I think the people of this State have a right to know the facts. We're laying those facts before them and I think it's one of the things that—I guess almost everything, in spite of the fact that we sometimes try, I think almost everything that an official or governmental official does can be looked upon as politics and I believe that the people ought to know the facts in this case. There are a lot of people involved and we've laid the facts before them as ably as we can. But certainly there's a great deal more to this than I've laid before them in that television film and I think that the people of this state are going to be completely and thoroughly shocked at what happened. The moral tone and the ethical standards of this government as exemplified by what happened down there at the Turnpike Commission when they get the results of the Grand Jury that is now convened here in Dauphin County."

Don Wear: "Go ahead John."

John Scotzin: "Governor, your statements at this instance, plus your film raised a question in my mind that in view of the fact that the Dauphin County Court turned over this matter to the Grand Jury yesterday. Is there any question of this case being pre-judged in your mind or influencing the Jurors who are considering it right now? They go home and listen to television Governor."

Governor Leader: "No, I don't think there is any danger."

John Scotzin: "No?"

Governor Leader: "Because the information that we put in there is already common knowledge, has already been published all over the State in newspapers. We haven't given any of the penetrating, the depth of information that are being presented to the Grand Jury. This is just superficial compared to the things that will be forthcoming, it seems to me, to the Grand Jury. We have been very cautious. There's a great body of information that we have at our fingertips obviously or we would not have asked for this investigating Grand Jury here under, incidentally, a Republican District Attorney in Dauphin County. We would not have

that members of the investigating Grand Jury or prospective members of the indicting Grand Jury and petit

asked for it if we did not have a great body of information. What we have said so far we have merely scratched the surface but I do believe the people of this Commonwealth are entitled to the information and ought to know the facts."

John Scotzin: "But my point Governor is, when you keep renewing your charges they are bound to have some influence on these jurors who are analyzing this evidence. Let me give an illustration. What if I went out and interviewed a hundred people downtown and I published the results of what they thought about this case. Say some of these decided Manu-Mines was guilty and some of these decided they were not guilty."

Governor Leader: "They wouldn't have the facts John. The facts that have been presented so far have been very limited. It's up to the Grand Jury to determine whether or not they are guilty but the superficial facts that we presented there are just the beginning. There's no doubt that we haven't backed them up with all the great, vast body of information that has been collected over the past six or nine months and that's the information that's now being presented to the Grand Jury. I have more faith in those members that they're going to judge the case either on the basis of what they've read in your newspaper or what they've seen in my telecast."

John Scotzin: "One more question."

Don Wear: "Go ahead, John."

John Scotzin: "If I publish those facts that I found in the poll, I think that the Dauphin County Court would take a dim view of me and probably call me in and reprimand me for that on the basis that it may be prejudicial."

Governor Leader: "Well, I don't think—I don't think they're going to be influenced that easy. If I didn't believe that the great body of information we have was enough to—ah—it makes a few things that you said in your papers and that I said in that telecast look ah—small because we have only scratched the surface. It's all superficial. The real case is being presented down there, I'm sure is being presented ably and well by one of the former Assistant District Attorneys of the City of Philadelphia. There is great and vast body of information and research and investigation and facts backing up that case and I have great confidence in the way it's being presented and the ability of the Grand Jury to interpret it and to come to a logical decision."

jury did not hear or see these broadcasts. While the court below stated that it had no reason to believe that the Grand Jury disregarded the admonitions relative to political speeches, it can be safely said that the indicting Grand Jury or the trial jury did not have the benefit of the court's admonition. Coming, as it did, from the Governor himself, the speeches undoubtedly had a forceful and prejudicial effect which tainted the proceedings. And while we do not ascribe any evil motive to the Governor in making these speeches at this time, we do say that they had a judicially undesirable effect when considerations of fairness and due process are involved and when the unbiased deliberations of an investigating Grand Jury were of utmost importance.

We believe that the irregularities referred to interfered with the substantial rights of the accused. Under the circumstances here presented, we cannot subscribe to the contention of the Commonwealth that these irregularities were cured by the action of the indicting Grand Jury because it had actual information before it, which information was placed in the presentment. Nor is it much solace to state that the use of the min-

John Scotzin: "Governor, conceivably the inquiring Grand Jury could determine that you have no case and throw it out and then nobody is going to be indicted?"

Governor Leader: "Well, yes it's conceivable."

John Scotzin: "The judge in his charge to the Jury told them there should be no presumptions of the guilt or innocence of anybody in these proceedings."

Governor Leader: "I guess that's the way they all start and that's the way law—the tradition of our law and justice in this country is said. And I think it will be interesting to see the developments in that Grand Jury and also be interesting to watch the developments in the Delaware Joint Toll Bridge investigation where there was also a lot of money being spent, extravagances and where they had Miss TNT from Gay Paree on the payroll as a part time secretary."

utes of the Grand Jury was improper. We cannot say that it was.

The motion to quash the presentment should have been granted under these circumstances. Failing so to do, the indictment should have fared no better. Cf. *Commonwealth v. Gross,* 172 Pa. Superior Ct. 85, 92 A. 2d 251. The extraneous factors here involved make out a clear case detrimental to the substantial rights of the defendant.

DISSENTING OPINION BY RHODES, P. J.:

I would affirm the judgment of sentence on the opinion of Judge KREIDER, the trial judge (reported in 72 Dauphin County Reporter 241), and the opinion of Acting President Judge NEELY as to the validity of the indictment charging defendant with misbehavior in office. Therefore I dissent.