Commonwealth, Appellant, *v.* Nichols.

Argued March 15, 1965. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*A. Joseph Rieffel,* Assistant District Attorney, with him *Joseph M. Smith,* Assistant District Attorney, *F. Emmett Fitzpatrick, Jr.,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellant.

*Abraham J. Brem Levy,* with him *Isaiah W. Crippins,* for appellee.

OPINION BY WATKINS, J., September 16, 1965:

These are appeals by the Commonwealth from orders of the Court of Quarter Sessions of the Peace of Philadelphia County sustaining the defendant's demur-

rers to the evidence in certain bills of indictment; and from orders of the court en banc granting motions in arrest of judgment and discharge of the defendant after conviction by a jury on other indictments.

D. Ward Nichols a duly elected Bishop of the African Methodist Episcopal Church was indicted for embezzlement by trustee on fourteen bills of indictment; embezzlement by agent on fourteen bills of indictment; and embezzlement by an officer of a corporation and fraudulent conversion on fourteen bills of indictment. There was a total of 42 indictments.

The case was called to trial in March of 1964. Shortly after the trial began the trial court granted the Commonwealth's motion to nolle prosequi the fourteen bills charging embezzlement by trustee so that they pass out of this case. Demurrers to the evidence were sustained in two bills charging embezzlement by agent and two bills charging embezzlement by officer of corporation and fraudulent conversion. The Commonwealth did not appeal from this action and these four indictments pass out of the case.

The defendant's demurrer to twelve indictments charging embezzlement by officer of corporation and fraudulent conversion were sustained by the trial court and this action was affirmed by the court en banc. The Commonwealth appealed.

Bills of indictment charging embezzlement by agent, officer of corporation and fraudulent conversion numbered 1396, 1397, 1409, 1410, 1761, 1762, 1764, 1766, 1767, 1769, 1770 and 1772, respectively, a total of twelve, were submitted to the jury. A verdict of guilty on all indictments was returned. The defendant's motion in arrest of judgment and the discharge of the defendant was granted by a majority of the court en banc composed of SLOANE, P. J., SAYLOR, J., and SHOYER, J. President Judge SLOANE dissented but was of the opinion that a new trial should be granted because the in-

troduction of some 140 checks by the Commonwealth had the cumulative effect of unduly confusing the jury to the prejudice of the defendant.

The crimes charged were brought under the Act of June 24, 1939, P. L. 872, §827, 18 PS §4827, which provides as follows: "Whoever, being an officer, director, superintendent, manager, receiver, employe, agent, attorney, broker, or member of any bank or other body corporate, or public company, municipal or quasi-municipal corporation, fraudulently takes, converts, or applies to his own use, or the use of any other person, any of the money or other property of such bank, body corporate or company, municipal or quasi-municipal corporation, or belonging to any person or persons, corporation or association, and deposited therein, or in possession thereof, is guilty of embezzlement, a felony, and upon conviction thereof, shall be sentenced to pay a fine not exceeding five thousand dollars ($5,000), or undergo imprisonment not exceeding five (5) years, or both."

And also under the Act of June 24, 1939, P. L. 872, §834, 18 PS §4834, which reads as follows: "Whoever, having received or having possession, in any capacity or by any means or manner, of any money or property, of any kind whatsoever, of or belonging to any other person, or which any other person is entitled to receive and have, fraudulently withholds, converts, or applies the same, or any part thereof, or the proceeds or any part of the proceeds, derived from the sale or other disposition thereof, to and for his own use and benefit, or to and for the use and benefit of any other person, is guilty of a felony, and upon conviction thereof, shall be sentenced to pay a fine not exceeding five thousand dollars ($5,000), or to undergo imprisonment not exceeding five (5) years, or both."

The African Methodist Episcopal Church is a protestant religious denomination, international in scope,

with more than one million members. The International church is represented in a so-called connectional manner by a General Conference which meets every four years. The church is administered on an international basis through various districts, committees and societies. The church internationally is divided into seventeen Episcopal districts, each of which is geographically described and is administered by a Bishop who is elected and assigned by the general conference.

Each Episcopal district is subdivided into smaller geographical areas which are governed by what is called Annual Conferences. Each Annual Conference meets yearly to deliberate and determine what course of activity will be pursued for the coming year. These Annual Conferences are administered by the Bishop of the district. The Annual Conference is composed of the individual churches within the geographical area. However, there are smaller subdivisions within the annual conference area which are organized under a presiding elder who is selected by the Annual Conference or by the Bishop. The local churches are generally independent corporations and function on an individual basis. Each of these subdivisions have a great deal of autonomy and operate as independent units.

The Bishop is the chief administrator of the Episcopal district and charged with the temporal and spiritual affairs of the district. How the district prospers is largely due to the administrative leadership of the Bishop. The Church from the time of its founding operated without any central, continuing body on the international level until 1936, when a corporation was formed, entitled the Board of Incorporators of the African Methodist Episcopal Church. The duty and purpose of this corporation was to represent the international church under the rules set forth in the discipline of the church which was the governing law; to take title to the real estate held by the international

organization and to represent it in all phases of its activity and to receive gifts, bequests, etc., in the name of the church and to generally operate as a board of trustees of the general conference of the African Methodist Episcopal Church. However, the reading of the articles of incorporation and the discipline of the church indicate that even after the incorporation of this group the autonomy of the subdivisions of the church was not greatly affected insofar as their operation and duties were concerned.

The church on the international level together with its various departments and societies were supported by assessments levied upon each member of the church and by collections in the local churches on connectional Sundays which were for specific purposes and which sums were collected in the local church, forwarded to the Bishop, who, in turn, was to forward the money to the various departments and societies at the international level. The finances of the Episcopal districts, the Annual Conference areas and the local churches were raised in the various geographical subdivisions and were disbursed according to the decisions made at the annual conferences and within the local churches. There was no set procedure by which the finances of the church were to be handled and apparently each district had its own method of operation. The local churches were almost completely autonomous in the maintenance, care, expenditure of the funds collected by them, other than those funds collected on connectional Sundays and the assessment of the church which they were bound to forward for use to the international body. Within the Episcopal districts and the Annual Conferences much the same was true.

The discipline is indefinite and conflicting in various sections as to the authority of the Bishop in the handling of funds on the Episcopal district and Annual Conference levels. However, there was a definite

restriction on his handling or use of any funds for the local individual church.

It was not until 1956 when the general conference held in Miami created what was called a central fund in the African Methodist Episcopal Church and this was known as the General Budget Fund which was to be administered by a general board to be elected by the conference. It was apparently the intention that all funds of the African Methodist Episcopal Church which were raised for connectional purposes, other than the funds of the local individual churches, were to be handled and administered by this board and through this fund. However, the financial activity of this group was limited to the handling and administering of funds raised for any connectional purpose.

The Bishops of the various districts were required to travel about their districts supervising annual conferences and generally administering all the work of the church. Bishop Nichols, in addition to these duties, was a member of several international church bodies and was required to travel abroad many times during the years of his service in the First Episcopal district.

The church on the Local, Annual Conference and Episcopal district level engaged itself in many activities which were not strictly church activities but were in extension of the general aims of the church and funds raised on the various levels were expended for these purposes. Among them being support of programs for the youth in the various areas of the church, for the establishment of facilities for the distributing of books and other literature to be used in the various churches and dissemination among its members.

A concise history of the facts upon which the charges are based as drawn from the almost 2000 pages of testimony and over 140 exhibits is as follows: The defendant was appointed to act as Bishop of the First

Episcopal District of the African Methodist Episcopal Church in May of 1948. This district included the New England States, New York, New Jersey, Delaware, the eastern part of Pennsylvania and Bermuda. He served the district until May of 1956 when he was assigned by the general conference to the Eleventh District in the State of Florida.

In January 1949, a checking account was opened in The Broad Street Trust Company in Philadelphia in the name of "D. Ward Nichols, Bishop Special Account". Only the signature of the defendant was required for withdrawals from this account. The explanation given for the opening of this account was that at the time he assumed his duties there was pending or threatened certain civil claims against the First District and this account was opened to assure the availability of funds to carry on the work of the church.

In September 1950, a checking account was opened in The Broad Street Trust Company in the name of "First Episcopal District Special Fund A.M.E. Church". Withdrawals from this account required the signatures of the defendant and two other ministers.

In May of 1951, a third checking account was opened in The Broad Street Trust Company in the name of "Philadelphia Annual Conference A.M.E. Church", and in order to withdraw funds from this account required the signatures of the defendant and two other ministers.

During the years since the opening of these accounts and 1956 funds from many sources were deposited in these various accounts and withdrawn and used for many and varied purposes, all of which, it appears from the record, were in connection with church activities of one kind or another. That all three of these accounts were church accounts cannot be doubted.

Although the conduct of the financial affairs of this large ecclesiastical district did not conform to the

standards which would be expected of a large business concern, the record does not disclose that any suspicions were aroused as to the conduct of the Bishop and those concerned with him in the financial activities of the church over the years until the present accusations. There was depositing and withdrawing from one account to the other over the years. We agree with the court below that the record does not substantiate the charge of misuse, embezzlement or conversion of the funds withdrawn from the Conference Account and the First District Account by the defendant and others and that the jury should not be permitted to speculate as to the ultimate use of the funds as to whether it was for church purposes or not, where either inference might be drawn from the circumstantial evidence presented at the trial.

In determining the propriety of the order below sustaining the demurrers as set forth above, we must decide whether the evidence of record at the time of the order and inferences reasonably drawn therefrom would support a guilty verdict. *Com. v. Kocher,* 162 Pa. Superior Ct. 605, 60 A. 2d 385 (1948); *Com. v. Fisher,* 189 Pa. Superior Ct. 8, 149 A. 2d 670 (1959). The court en banc was unanimous in sustaining the action of the trial judge in granting demurrers to the twelve indictments charging embezzlement by officer of corporation and fraudulent conversion and a close examination of the Commonwealth's brief indicates that the Commonwealth made little, if any, effort to sustain its appeal from the lower court's action.

The evidence submitted in support of the indictments was circumstantial and although this certainly is not fatal to the Commonwealth's case, the theme of guilt must flow from the facts and circumstances proved, and be consistent with them all. *Com. v. Evans,* 190 Pa. Superior Ct. 179, 154 A. 2d 57 (1959). The facts and circumstances must not only be consistent

with and point to the guilt of the accused but they must be inconsistent with his innocence. *Com. v. Kolsky,* 100 Pa. Superior Ct. 596 (1931). A large part of the evidence of the Commonwealth showed proper use of the fund and indicated the accepted method of doing business in the district for a long period of time.

As to the specific bills of indictment to which the trial court sustained demurrers the following is a brief statement of the evidence to support them.

Bills Nos. 393 and 395 concerned Chataqua funds. A chataqua was a special meeting of the elders and officers of the churches of the district with the Bishop. These meetings were not authorized directly by the discipline but they have been held over the years and so have historical sanction. The defendant deposited Chataqua funds in the Bishop's Special Account. There is no evidence of the disposition of the funds.

Bills Nos. 1406 and 1407 concerned the expenditure of money for the remodeling of the Allen building by the Allen Building Committee. The account in question was separate and apart from the accounts we have been discussing. This fund had been created for the specific purpose for which it was used.

Bills Nos. 1411 and 1433 concerned insurance money received by the defendant as the result of storm damage to the Ruffin-Nicholas church which had been purchased by the First District and which defendant deposited in the Bishop's Special Account.

Bills Nos. 1774 and 1775 concerned a check drawn on the Annual Conference Account made payable to Rev. Dandridge and cashed by him. The proceeds were turned over to the defendant. The check was marked for expenses of the Bishop's conference meeting and this was the only evidence of its ultimate use.

Bills Nos. 1776, 1778, 1779 and 1781 concerned funds of the Annual Conference which were deposited

by the defendant in the Bishop's Special Account. These were not local church funds.

In considering demurrers the courts have uniformly held that the proper test in determining the validity of an indictment is whether evidence of record and inferences reasonably to be drawn therefrom would support a guilty verdict. *Com. v. Fisher,* 189 Pa. Superior Ct. 8, 149 A. 2d 670 (1959); *Com. v. McSorley,* 189 Pa. Superior Ct. 223, 150 A. 2d 570 (1959).

The Bishop in the above indictments was charged with embezzlement and fraudulent conversion to his own use of certain monies allegedly belonging to the Board of Incorporators of the African Methodist Episcopal Church. There was no evidence in the record to prove that the money actually belonged to the board. There was no evidence of ownership nor did anyone point to a single check that was not used for church purposes. We agree with the court below that the demurrers were properly sustained. As the court below said:

". . . The prosecution further contended that under the law of the church, which is set forth in the Discipline and approved (as amended) every quadrennium by the General Conference, the Bishop lacked authority to handle church funds under any circumstances. The Discipline does not so state, however, and the record is bare of any reliable evidence on which to rest such a claim. Rev. Alexander, a Commonwealth witness, who was neither called as an expert on Church law nor claimed to be an authority on the subject, gave expression to his personal opinion, but the phraseology and clear meaning of paragraphs 268, 338(1) and 341 of the Discipline are to the contrary. These sections speak of the Bishop's duty to collect church funds, to distribute them in stated percentages, and prescribe penalties for 'illegal handling' of the same. Rev. Chas. E. Stewart, the expert on whom the Commonwealth did

rely, stated that a bishop had no right to handle funds belonging to a local church, but he expressly refused to extend this prohibition to other monies.

"Contrary to the prosecution's contention, Bishop Bright, one of their chief witnesses, stated that it was customary for the pastors and the elders of the church to meet in a district conference once or twice a year and to maintain a district bank account. This important witness, who had served as a pastor under the defendant during seven of the latter's eight years of episcopal administration here, testified that he came to Philadelphia in June, 1949. Careful examination of this record convinces one that the prosecution's case must stand or fall on the testimony of this witness. He admitted that he long knew of the existence of this special bank account and that he was told that it was opened to protect the funds of the district from the embarrassment of legal attachments. Nevertheless, the District Attorney in answer to the court's questions refused to commit himself as to whether he considered this a district account or a personal account.

"Regardless of the prosecutor's failure to maintain a definite and unequivocal position, however, the Commonwealth offered no satisfactory proof that the funds in the account belonged to the Board of Incorporators of the African Methodist Episcopal Church as alleged in all Bills of Indictment. The prosecution contented itself with resting on those portions of the Articles of Incorporation set forth on pages 19 and 21 of the Book of Discipline which give the Board of Incorporators authority over all funds where title 'is vested in the African Methodist Episcopal Church, its Auxiliaries, Departments, Board and Societies as well as any funds both in the Treasury of the General Church and all of its created Boards, Auxiliaries, Departments and Societies, . . . The Board of Incorporators is made amenable to the General Conference of the said African Meth-

odist Episcopal Church under the terms set out in said Book of Discipline . . .

" '. . . This Corporation shall hold in trust for the benefit of the African Methodist Episcopal Church any and all donations, bequests, gifts, grants and funds, etc., that may be given or conveyed directly to the African Methodist Episcopal Church, or to the Corporation herein for the benefit of the said Church, or for the benefit of persons, societies, auxiliaries, departments and boards of said Church . . .'

"Since Bishop Bright testified that it was customary, although not in the Discipline, for the district to have its own bank account in which to deposit funds for 'church expansion' or 'special projects', it was essential that the Commonwealth prove a resolution by the General Conference exercising its authority over the funds in question or laying claim to the same. The Articles of Incorporation are not self-executing as to district funds, or funds of any local Church or conference. The Act of 1855, P. L. 328, as amended by the Act of 1935, P. L. 353, 10 P.S. §81, gives supreme authority to the acts controlling church bodies and officials which are consistent with church law, but it is no substitute for their official action. In this respect the instant situation differs from those existing in the cases relied on by the Commonwealth such as Church of God at Markleysburg, 355 Pa. 478, Tabor Presbyterian Church, 347 Pa. 263, Morris v. Featro, 340 Pa. 354, Canovaro v. Brothers of Order of Hermits of St. Augustine, 326 Pa. 76. Proof of ownership is essential to sustain a charge of conversion of the funds of another. As held by our Superior Court in Commonwealth v. Glass, 199 Pa. Superior Ct. 542, 549, 'An allegation of particular ownership of funds alleged to be converted is necessary in the indictment. Commonwealth v. Shanklin, 87 Pa. Superior Ct. 53.' Here just as in the Glass case, 'the charges of the indictment find no support from the facts or by the law.'

"At one point during the lengthy trial the prosecution was evidently disturbed by this weakness in its case and sought to amend (N.T. 909) so as to charge that certain funds belonged to the district. Defense counsel objected on the grounds that this was in violation of the defendant's constitutional rights, relying on Stirone v. United States, 361 U.S. 212 (1960), a unanimous decision by the United States Supreme Court. In that case the court held that after an indictment has been returned by a grand jury its charges may not be broadened through amendment except by the grand jury itself; and that a variation between an indictment and proof cannot be dismissed as harmless error where that variation destroys the defendant's substantial rights to be tried only on the charges presented in an indictment returned by a grand jury. The court further stated that the purpose of the requirements of the Fifth Amendment of the Constitution of the United States that a man be indicted by a grand jury, is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecution attorneys or a judge, and that this purpose is defeated by any device or method which subjects the defendant to prosecution for an act which the grand jury did not charge. Whenever 'a fundamental right, essential to a fair trial' is involved, the due process clause of the Fourteenth Amendment to the United States Constitution requires that the state courts follow federal procedure: Escobedo v. Illinois, 32 U.S. Law Week 4605 (June 22, 1964); Jackson v. Denno, 84 S. Ct. 1774, 32 U.S. Law Week 4620 (June 22, 1964); Gideon v. Wainwright, 372 U.S. 335, 340, 83 S. Ct. 792, 794; and see Palko v. Connecticut, 302 U.S. 319.

"Since the evidence on both sides pointed to church funds in this special account belonging to the First Episcopal District rather than to the Board of Incorporators, there is a variance between the indictment and

the proof. Initially such variances were held to be fatal. See Commonwealth v. Martin, 5 Clark 245, (Pa. 1853), Commonwealth v. Liebowitz, 143 Pa. Superior Ct. 75, 79. Later cases have held harmless variances to be amenable, following the provisions of the Act of 1860, P. L. 427, §13, 19 P.S. §433. The cases, however, which have allowed such amendment may be distinguished from the present situation as, for example, Rosenberger v. Commonwealth, 118 Pa. 77, where the indictment laid the property stolen as the property of 'A and B' but on the trial the evidence showed that the property so charged belonged partly to A and partly to B. Or Commonwealth v. Liebowitz, supra, where amendment to show an alias of the defendant was permitted inasmuch as the name originally laid in the indictment was the name given by the defendant himself when first apprehended and arrested. The present situation is vastly different, charging the defendant as it does with accountability to the Board of Incorporators of the African Methodist Episcopal Church, and there being a complete lack of evidence that the funds involved ever came from that source or that the Board of Incorporators had ever attempted to exercise jurisdiction over said funds or to require defendant to account for the same.

"The failure of the Commonwealth to pin down without equivocation the character of the act of Bishop Nichols in opening the special bank account is an omission we cannot overlook. Certainly the account was created openly with the knowledge if not the approval of the clergy and elders in his episcopal district. Bishop Bright testified that it was customary for the elders of the District to have their own bank account, as indeed they did, and if the existence of such an account was not contrary to the laws of the church then the form of the account could not be deemed illegal or fraudulent per se. 'The act and the motive are sepa-

rate issues to be separately determined. A corrupt motive can be inferred from the act only within a climate of facts which makes that inference reasonable.': Commonwealth v. McSorley, 189 Pa. Superior Ct. 223, 230.

"While this defendant, perhaps, is not entitled to the same presumption of honesty of 'purpose and good faith in the performance' of his official acts as a public officer, yet he did occupy the highest of offices in one of our major Protestant denominations. Presumably he was 'blameless' in character and qualifications (cf. I Timothy 3:2) when duly elected 'by a majority of all votes cast': Discipline, par. 170. . . .

"In evaluating defendant's motion in arrest of judgment consideration must be given to this whole lengthy record. Witnesses on both sides testified to the handling of thousands of dollars in cash in a manner which is startling to any one who is acquainted with the administration of the temporal economy in other large religious denominations. Minutes, receipts and other records placed in evidence were hand-written rather than typed, and amateurish, even crude. Yet it is significant that well educated and highly respected officials called as witnesses by the prosecution, such as Rev. Nearn and Dr. Mance, saw nothing unusual in defendant's handling of church funds; and the chairman of the Episcopal Committee at the General Conference, Rev. Alexander, testified that approval of the bishop's records was embraced in the 'passing of his character' following the customary quadrennial examination. . . .

"True the same volume and quality of evidence are required to convict in this case as in any other, i.e., beyond a reasonable doubt, but this distinction must be recognized that we are dealing here almost entirely with circumstantial evidence and one of the admitted circumstances is that all during the eight years under review defendant was a bishop in good standing so

that circumstances as to his handling of church funds must be judged by full recognition of his status as a bishop and officer of the church—not a mere agent. . . .".

In the matter of the order arresting judgment, we must consider the entire record and determine whether there is sufficient evidence to establish the guilt of the defendant. Act of June 15, 1951, P. L. 585, 19 PS §871. The court was not given jurisdiction under the Act to pass upon the credibility of the witnesses or to determine whether it would have arrived at the same verdict as the jury did. We must, therefore, after a verdict of guilty, accept as true all of the Commonwealth's evidence upon which the jury could have based the verdict. *Com. v. Phillips,* 372 Pa. 223, 93 A. 2d 455 (1953) ; *Com. v. McSorley,* supra.

We shall now consider the bills upon which motions in arrest of judgment were sustained by the court en banc below after the return of guilty verdicts with regard to each bill respectively.

Bills Nos. 1396 and 1397 were concerned with the fact that there was substantial balance in the Bishop's special account in May, 1956 when the Bishop, while being questioned by the examining committee at the general conference held at Miami, stated he had no funds of the church in his possession. Concluding that the accounts referred to in this opinion were church accounts this statement must be accepted as true.

Bills Nos. 1761, 1762, 1764, 1766, 1767, 1769, 1770 and 1772 all concerned checks drawn on the First Episcopal District account and on the Bishop's Special Account at the General Conference in Miami in 1956. The checks were cashed by Dr. Mance and then, as the record indicates, disbursed to delegates, alternate delegates and used for other expenses connected with the church delegations to the conference under the jurisdiction of the defendant. The evidence supports the

conclusion that under the circumstances prevailing in the Miami conference a cash disbursement was necessary and was in pursuance of the legitimate exercise of his duties as the Bishop of his district at the conference.

Bills Nos. 1409 and 1410 resulted from the events revolving around the "Allen Building" named for the founder of the A.M.E. church and located in Philadelphia. This building had been owned by the church and was lost at sheriff sale. In 1949 the defendant under pressure from members of the church, purchased the building in his own name for $54,000, which money he had borrowed for that purpose. He was not successful in having the General Conference purchase the building from him but at a meeting of the elders of the First District in 1953 it was decided an effort would be made to raise sufficient money to purchase and repair the building. The sum of $91,580 was raised by a committee made up of many of the leading members of the district called the "Allen Building Fund Committee". In pursuance of the project the committee took charge of the building, paid the taxes, collected the rents and expended money for repairs. It was then decided to take title in the name of the Pension Department, a certain corporation of the church, the name of which indicates its purpose. The Allen Building Committee gave the Pension Department $30,000 for the express purpose of making a payment on the purchase price to the defendant. This was done and title was transferred to the Pension Department with great public fanfare in 1955.

All of the above was a legitimate pursuit by the district and under no prohibition from the General Conference or the discipline of the church, even though the General Conference or its subordinate department had refused the building after much discussion and disagreement.

The Commonwealth contends that because the defendant was Bishop of the First Episcopal District and a member of the Board of Pensions this project was performed for his personal gain and was motivated by an ulterior design. We cannot accept the inference urged by the Commonwealth that all the fine, educated and responsible members of the church, one of whom is now a Bishop, named in this record, were dupes and pawns of the defendant, merely because of his position or that they would stoop to complicity in criminal acts. The record does not clearly show the ultimate fate of the Allen Building. However, it can be inferred that it is presently titled in some department of the church.

The defendant on April 19, 1956 deposited two checks drawn to his order by the Pension Dept. in July, 1955, as part of the alleged purchase price of the Allen building, in the amounts of $10,000 and $20,000 respectively, in the Bishop's Special Account. He had previously deposited a $4000 personal check in the account. After the defendant was transferred from the First Episcopal District to the Eleventh Episcopal District he drew on the special account for his own benefit, claiming he was withdrawing his personal funds.

These deposits by the defendant of his personal funds did constitute a commingling in an account which the defendant claims and the evidence established was church funds. The monies deposited to this account from church sources were from such diversified origins that it cannot be said from the present state of the record that it did not contain some money to which the international church organization was entitled.

The jury could possibly infer from this record a fraudulent intent in the commingling of church and personal funds and the personal use of the funds in the account to sustain a verdict of guilty. *Com. v. Burns*, 198 Pa. Superior Ct. 208, 182 A. 2d 232 (1962). In fact, in sustaining the demurrers to the bills as dis-

cussed above and in affirming the arrest of judgment in all but two of the indictments now under discussion, it was necessary to determine that the evidence was conclusive that the accounts as described hereinabove were church funds.

However, in view of the number of indictments and the number of exhibits introduced by the Commonwealth in attempting to support the other indictments, we agree with Judge SLOANE of the court en banc below that their introduction, not being germane to the bills, was confusing to the jury and prejudicial to this defendant so that a new trial is necessary in the interest of justice.

The orders are affirmed in Nos. 362 to 373, inclusive, October Term, 1964. The orders are affirmed in Nos. 51, 52 and 55 to 62, inclusive, October Term, 1965. The orders are reversed in Nos. 53 and 54, October Term, 1965, and a new trial granted.