Commonwealth *v.* Carroll, Appellant.

Argued October 7, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*James F. Toohey,* with him *Quinn, Plate, Gent, Buseck and Leemhuis,* for appellant.

*Robert H. Chase,* Assistant District Attorney, with him *Michael M. Palmisano,* Assistant District Attorney, and *William E. Pfadt,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, June 28, 1971:

On the evening of July 31, 1967, the City of Erie experienced some racial disturbance and the police were patrolling the general neighborhood around 18th and Holland Streets. There were several fires reported in that area, and a fire was burning just north of the intersection of 18th and Holland Streets. Fire trucks and equipment were parked near the intersection and a large crowd had gathered in the area. At approximately eight o'clock p.m. the police discovered some flammable material near a building close to the intersection and attempted to arrest a person named Benny Wall in connection with these materials. Wall was standing in a crowd of about one hundred persons in front of a tavern known as the Chesterfield Lounge, located on the southeast corner of the intersection of 18th and Holland Streets. Wall resisted arrest and the arresting officers called for help.

In the midst of this confusion, Officers Woolis and Crock arrived in a patrol car with two police dogs and they parked their car approximately 126 feet north of the intersection in an alley. Upon hearing the cries for help from their fellow officers who were arresting Wall, they ran with their dogs south to the intersection and then east on 18th Street to the patrol car, where the officers were struggling with Wall. Somewhere along their short path of travel, bottles were thrown at Officers Woolis and Crock.

About an hour later, Officer Woolis returned to the Chesterfield Lounge and arrested Samuel Carroll, the appellant, for participating in a riot by throwing a bottle. Appellant, a Negro male, was working at the time of the arrest as a bartender at the Chesterfield Lounge. A short time later, Officer Crock entered the Chesterfield Lounge and arrested Earl Lee Barnett for participating in a riot by throwing a bottle.

Appellant Carroll and Barnett were tried jointly and were found by a jury guilty of participating in a riot. The lower Court denied defendants' motions for a new trial and in arrest of judgment. On May 5, 1969, appellant was sentenced to the Allegheny Workhouse for a period of 1½ to 3 years. The Superior Court affirmed, Per Curiam, and we granted allocatur.

The central question in this appeal was appellant's challenge to the jury array and the jury panel, *because the jury panel* from which the jury which tried this case was selected, *did not include any Negroes.* Appellant contends that in the light of these facts he was denied Equal Protection of the Law because the jury that convicted him was necessarily biased and *did not reflect a true cross-section of the community.* In essence, appellant attacks the jury selection system in Erie which gathered the names for the jury panel (see infra), and contends that the system discriminates against Negroes

and other minority groups, as well as people in a lower economic category in general.

The United States Supreme Court has held in an unbroken chain of cases stretching over almost a century that the exclusion of Negroes from jury service *on account of race* violates the Equal Protection Clause of the 14th Amendment of the United States Constitution.* See, e.g., *Ex parte Virginia,* 100 U.S. 339; *Strauder v. West Virginia,* 100 U.S. 303; *Neal v. Delaware,* 103 U.S. 370; *Bush v. Kentucky,* 107 U.S. 110; *Rogers v. Alabama,* 192 U.S. 226; *Hollins v. Oklahoma,* 295 U.S. 394; *Pierre v. Louisiana,* 306 U.S. 354; *Smith v. Texas,* 311 U.S. 128; *Hill v. Texas,* 316 U.S. 400; *Patton v. Mississippi,* 332 U.S. 463; *Akins v. Texas,* 325 U.S. 398; *Cassell v. Texas,* 339 U.S. 282; *Avery v. Georgia,* 345 U.S. 559; *Hernandez v. Texas,* 347 U.S. 475; *Eubanks v. Louisiana,* 356 U.S. 584; *Swain v. Alabama,* 380 U.S. 202.

The proper functioning of the jury system, and indeed its very existence within our legal society, and the confidence of the people which is so important to its maintenance and indeed to its very life, mandates that a jury be a "body truly representative of the community," and not a representative body of any special group or economic class. As the Court stated in *Smith v. Texas,* 311 U.S., supra (page 130) : "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination

---

* This Constitutional principle of nonexclusion has also been applied "to any identifiable group in the community which may be the subject of prejudice." *Swain v. Alabama,* 380 U.S. 202, 205. See also, *Hernandez v. Texas,* 347 U.S. 475 (Mexican-Americans in Texas) ; *Rabinowitz v. United States,* 366 F. 2d 34 (5th Cir. 1966) (white civil rights workers and Negroes) ; *United States ex rel. Leguillou v. Davis,* 115 F. Supp. 392 (D.C. V.I. 1953) (persons of Puerto Rican origin in the Virgin Islands).

to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it, but is at war with our basic concepts of a democratic society and a representative government."

The goal of this Constitutional principle is to have a jury fairly represent a cross-section of the community. *Ballard v. United States,* 329 U.S. 187; *Thiel v. Southern P. Co.,* 328 U.S. 217; *Glasser v. United States,* 315 U.S. 60; *Brooks v. Beto,* 366 F. 2d 1 (5th Cir. (1966)). The concept of a jury composed of a cross-section of the community is clearly embodied in our own Constitution. Section 9 of Article I of the Constitution of Pennsylvania provides: "In all criminal prosecutions the accused hath a right to . . . a speedy public trial by an *impartial** jury of the vicinage."

A token representation of the significant identifiable groups in the community is not sufficient. *Swain v. Alabama,* 380 U.S., supra, at page 206; *Avery v. Georgia,* 345 U.S., supra; *Akins v. Texas,* 325 U.S., supra; *Thomas v. Texas,* 212 U.S. 278. However, obtaining a cross-section of the community does not require that the jury be a "perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." *Swain v. Alabama,* 380 U.S., supra, at page 208. Accord: *Hernandez v. Texas,* 347 U.S., supra, page 482; *Cassell v. Texas,* 339 U.S., supra, page 287; *Akins v. Texas,* 325 U.S., supra, page 403; *Martin v. Texas,* 200 U.S. 316, 321.

To summarize: The United States Constitution does not permit a token, nor require a proportional representation of the various identifiable groups of the community in a jury panel. The composition of the jury panel must be the product of either "operation of an honest exercise of relevant judgment or the uncon-

---

* Italics, ours.

trolled caprices of chance." *Cassell v. Texas,* 339 U.S., supra, at page 291 (FRANKFURTER, J., concurring).

With these principles in mind, we shall examine the operation of the selection processes for juries in Erie County and the jury panel from which appellant's jury was selected.* The two elected Jury Commissioners wrote to the leaders of the various churches, social and fraternal clubs, and committeemen of the political parties in Erie, asking for a list of names for jury service. The Commissioners also received additional names from friends and acquaintances. The names of the clubs and churches were obtained from the yellow pages of the telephone directory. The Jury Commissioners testified that they had actual knowledge that such letters were sent to the predominantly Negro clubs and churches, but did not know or recall whether they had responded to the inquiry. There was also testimony that contact was made with the Negro committeemen, but, again, the Commissioners did not know or recall whether any names were supplied from these sources. Approximately one-half of the names placed in the jury wheel were gathered in this manner. The other half were supplied by three Judges of the Court of Common Pleas of Erie County. There is testimony that one of the Judges went through the voter registration lists and gathered names, but there was no testimony offered as to how the other Judges gathered and supplied names for jury service. Once the names were received by the Commissioners from the various sources, there was no way to tell whether the person was white or black. At this point, the names were then turned over to the Secretary of the Jury Commissioners, who placed them in a locked jury wheel for later random selection.

---

* The selection and qualifications of jurors in Erie—3rd Class County—is controlled by the Act of April 16, 1925, P. L. 244, Section 2, 17 P.S. §1322, et seq., and the General Jury Selection Act of April 10, 1867, P. L. 62, Section 2, 17 P.S. §941, et seq.

It was stipulated that Erie County has a population of approximately 267,427 and the estimated number of Negroes in the area is 9,980, or 3.73% of the population. The jury panel for the Special Term of December, 1968, from which appellant's jury was selected did not include a Negro.* Since the September Session of 1966, 12 Negroes served on the grand juries and criminal court petit juries, and this represented 1.05% of the jurors actually serving.

The Erie County Jury Commissioners use what is commonly referred to as the "key-man" system. The "key-man" jury selection system has been sustained where there is evidence that the jury commissioners have familiarized themselves with all of the significant elements in the community and have made a special effort to consult leaders from these various population groups. See *Swain v. Alabama,* 380 U.S., supra, at pages 207-208; *Billingsley v. Clayton,* 359 F. 2d 13 (5th Cir.), cert. den., 385 U.S. 841. Cf. *Chance v. United States,* 322 F. 2d 201 (5th Cir.), cert. den., 379 U.S. 823; *United States v. Hunt,* 265 F. Supp. 178, 194-195 (W.D. Tex.).** There is clear and convincing evidence that the Jury Commissioners specifically sought out and contacted Negro committeemen, Negro

---

* The testimony given by the Jury Commissioners concerned the selection for the 1967 panel and it was stipulated that the special panel from which appellant's jury was selected in 1968 was done in the exact manner as for the 1967 panel.

** There has been recent widespread criticism of the "key-man" system as having a tendency towards producing uniformity among jurors reflecting the same social, economic and racial group of key men and, in turn, jury commissioners. See generally, Kuhn, *Jury Discrimination, The Next Phase,* 41 S. Cal. L. Rev. 235, 260-264; Lindquist, *An Analysis of Juror Selection Procedure in the United States District Courts,* 41 Temp. L. Q. 32; Note, *Jury Selection by Race,* 79 Yale L.J. 917. The Federal Courts have recently changed from the "key-man" system to the random selection system taken from voter registration lists. See Jury Selection and Service Act of 1968, 28 U.S.C.A. Sec. 1861 et seq.

church leaders, and Negroe club leaders to obtain names for jury service. The Jury Commissioners were aware of the concentration of the Negro population in different areas of the City of Erie and attempted to secure names and contacts in these areas to get additional names.

The fairness of this jury system must be obvious. The fact that the jury panel was not 4% Negro does not violate the Constitution nor invalidate appellant's conviction, because he "is not Constitutionally entitled to demand a proportionate number of his race on the jury which tries him, nor on the venire or jury roll from which petit jurors are drawn." *Swain v. Alabama*, 380 U.S., supra, at page 208. We have made a searching examination of the record and conclude that the panel was the product "of the operation of an honest exercise of relevant judgment," in an attempt to have the jury panel *fairly represent* a cross-section of all the significant identifiable groups, including Negroes within the community. See *Cassell v. Texas*, 339 U.S., supra, at page 291 (concurring Opinion).

Appellant's next contention is that the lower Court erred in not granting his motion for a demurrer at the end of the Commonwealth's evidence. The test to be applied at that time is whether the Commonwealth's evidence and all reasonable inferences therefrom are sufficient to support a verdict of guilty of the crime for which he was indicted. *Commonwealth v. Chasten*, 443 Pa. 29, 275 A. 2d 305 (1971); *Commonwealth v. Schmidt*, 437 Pa. 563, 263 A. 2d 382; *Commonwealth v. Commander*, 436 Pa. 532, 260 A. 2d 773.

Appellant contends that the only direct evidence offered by the Commonwealth was the testimony of Officer Woolis, and it was inconclusive and inconsistent. We disagree. Officer Woolis testified that he was struck by a bottle hurled from the general direction of the Chesterfield Lounge as he entered the intersection

attempting to assist his fellow officers. He further testified that he was acquainted with appellant and his family because he had had a beat in appellant's neighborhood for over a year. *He definitely identified appellant as the person who threw the bottle* at the time of the incident and made the arrest within one hour thereafter. Our review of the evidence convinces us that the Commonwealth's evidence was undoubtedly sufficient to support a guilty verdict.

Appellant's final contention is that the lower Court erred in refusing to accept his point for charge concerning his alibi defense. Appellant testified that he was working in the bar as a bartender during the racial disturbance and the rioting, and never went outside. We have reviewed the lower Court's charge and find that it accurately and adequately stated the law concerning an alibi defense and indeed included all the significant portions which appellant's requested point for charge contained. We find no merit in this or in any other contention of the appellant.

Judgment of sentence affirmed.

Mr. Justice COHEN took no part in the decision of this case.