## Commonwealth v. Bagalini

*Frank S. Kelker,* Assistant District Attorney, for Commonwealth.

*Richard Martin, Stanton Levenson* and *James Brown,* for defendants.

KLEIN, J., November 30, 1972.—The matter before the court arises from defendants' challenge to the array of the grand jury inpaneled on October 30, 1972. (Defendants also specifically challenged for cause one of the jurors summoned. Upon agreement of counsel, the court ordered the challenged juror to stand aside during the consideration of any and all bills of indictment concerning these defendants. It was also agreed that the court would continue the hearing set in this matter to a later date upon request of defense counsel with the understanding that the October 30th grand jury would act upon the bills without prejudice to the rights of defendants or the Commonwealth.)

In addition to challenging the selection process, defendants alleged that petitions were circulated in the county, the purpose of which was to seek removal of these defendants from their positions as law enforcement officers (constables) and that, together with publicity connected with this case, rendered impossible the selection of a fair and impartial grand jury. No proof was offered concerning the latter allegations so that the sole issue before the court is the selection process itself.

Defendants have also made a bald assertion that the Pennsylvania Rules of Criminal Procedure, precluding interrogation of prospective grand jurors, denies defendants due process, equal protection of law and a fair trial.

Since all persons accused of crime face the same procedure, we cannot comprehend how these defendants are being denied equal protection of the laws. So far as due process is concerned, we believe that the criminal justice system embodied in our laws, rules of evidence and rules of procedure are replete with guarantees of defendants' rights and the mere fact that

voir dire examination of grand jurors is not permitted is without significance in this context.

In the case of Commonwealth v. Dessus, 214 Pa. Superior Ct. 347 (1969), the court held that grand jurors may not be challenged for *bias*, and, the court continued, "The Federal Courts do not allow it: Estes v. U.S., 335 F.2d 609 (1964)."

Before one accused of crime can be found guilty by a jury, voir dire examination of trial jurors is permitted to best assure a fair and impartial jury with an unlimited number of challenges for cause as well as several peremptory challenges available to defendants.

Therefore, we hold that the rule precluding voir dire examination of grand jurors does not deny defendants equal protection of the law, due process and a fair trial.

## FINDINGS OF FACTS

1. The jury commissioners were ordered by Hon. John N. Sawyer, President Judge of this court, to fill the jury wheel with a total of 3,300 names for service during 1972 in mode and manner now directed by law and to seal and lock the said wheel as provided by law.

2. Some time prior to the making of said order, a meeting was held with the jury commissioners by Judge Sawyer in which the court administrator, Clifford Kirsch, participated.

3. At said meeting, it was decided, following review of a feasibility study and recommendations of I.B.M. and the county's consulting engineer for data processing, to use the county's computer system for the selection of prospective jurors to serve in 1972. This was the first time such system was used.

4. It was agreed that the computer should select 7,700 names by "pulling" the name of every twelfth person from the then current voter registration lists of the county in order to have the names of 3,300 "truly available" sober, intelligent and judicious electors for placement in the jury wheel.

5. It was agreed that two-card postal cards would be sent to all 7,700 persons so selected calling for the return of one card to the jury commissioners upon which the prospective juror would indicate his name, address, occupation, age, birth date, voting district, telephone, prior jury service, party affiliation and a space for indicating any illness or condition which might affect the prospective juror's ability to serve.

6. It was agreed that it could be anticipated that many would not return the cards at all, or be dilatory in returning the cards (as many as 2,700 did not) or indicate some illness or condition that would hamper their ability to serve as required, in addition to recognizing that many of the 7,700 would be deceased or removed from their registered addresses so that they would not receive the cards in the first instance. The purpose of starting with 7,700 with the goal of placing 3,300 names in the wheel was to provide the jury commissioners with 3,300 persons who were "truly available" to serve and further to provide the jury commissioners with a basis for determining eligibility of the jurors (judges and lawyers have been selected by the computer) and screening out the legitimate excuses. It was not for the purpose of permitting the jury commissioners to "discriminate" as to which names would be placed in the jury wheel and there is no evidence of any such "discrimination."

7. The clerk to the jury commissioners pursuant to

instructions by the jury commissioners, processed the cards by sending to data processing *all* cards returned where no problem was indicated, for the purpose of having the computer print the names on a piece of paper, fold same, etc., for subsequent placement in the jury wheel. Where the clerk concluded that a condition existed adversely affecting prospective jury service, she coded the card in accordance with the jury status codes provided her: "Permanent hearing defect"; "Permanent Blindness"; "Permanent confinement to bed or wheelchair"; "Temporary disability"; "Critical or privileged occupation"; "Other permanent disability"; or "Excused—exceptional circumstances." In some cases the clerk made efforts to verify the claimed "excuse" or "disqualification" and in some cases she did not. No evidence was produced as to the number so coded. All other cards received after 3,300 were available were "returned to the computer" for the possible selection in ensuing years.

8. The clerk included in the 3,300 those who requested excuse for reasons such as prior military service or where her effort to verify the reason satisfied her that there was no basis for excuse. And the clerk counselled with the jury commissioners and followed their instructions when in doubt.

9. The computer printed slips were placed in the jury wheel in accordance with the law on that subject.

10. All of the 3,300 names placed in the jury wheel for 1972 were among the 7,700 names selected as above set forth.

11. No evidence was produced that those coded as being unavailable for service belonged to any identifiable group such as by age, other than those who claimed to be "too old to serve," sex, race, geographic area, party, etc. No elderly person who did not claim to be "too old to serve" was excluded. No

person with any physical disability who did not indicate that the disability would affect jury service was excluded.

## DISCUSSION

Although, defendants in their brief, entitle the issues as "constitutional" questions, our understanding is that their challenge is two-pronged. One is a constitutional challenge; the other a failure to select jurors substantially in accordance with law, a state statute. This involves a vital distinction.

Pennsylvania Rule of Criminal Procedure 203 provides that, ". . . A challenge to the array may be made only on the ground that the *grand jury* was not selected, drawn or summoned *substantially* in accordance with law . . ." (Italics supplied.)

The Act of April 10, 1867, P. L. 2, sec. 2, 17 PS §942, provides:

"It shall be the duty of said jury commissioners, president judge, or additional law judge of the respective district, or a majority of them, to meet at the seat of justice of the respective counties, at least thirty days before the first term of the court of common pleas, in every year, and thereupon proceed, with due diligence to select, alternately, from the whole qualified electors of the respective county, at large, a number, such as at the term of the court of[1] pleas next preceding shall by the said court be designated, of sober, intelligent and judicious persons, to serve as jurors in the several courts of such county during that year; . . ."

For the year in question, 1972, for the first time, the *jury commissioners* and the president judge decided to resort to the use of the county's computers,

---

" [1] 'Common' should probably be inserted."

upon recommendation of experts in the field, to develop a pool of electors from which juries would be selected. The decision was made for the purpose of improving the efficiency of the administration of justice and to best insure the utter and complete impartiality and randomness in the selection of prospective jurors.

It was determined that 3,300 electors who were in every sense of the term "available" for selection with no known disability were required for the year 1972. In order to assure the availability of said 3,300, it was determined that the computer would develop an original list of 7,700 electors by a random selection. This was accomplished by having the computer select every twelfth name of all of the voters lists, there being more than 90,000 persons on such lists. The estimated need of 7,700 names in order to result in 3,300 available recognized that many would be deceased, removed from their registered address and others unavailable for compelling reasons such as disability, the need to care for young children and disabled family members where suitable baby sitters are not available, etc. It was estimated that many would not timely return the information cards.

Defendants concede that there was nothing improper about selecting the 7,700 names. There is also no evidence that the summoning of those called for grand jury service on October 30, 1972, was in any way improper either. The sole thrust of the challenge is that there was no fair and impartial standards or regulations with respect to selecting the 3,300 from the list of 7,700. There is no challenge to the "drawing" or "summoning" of jurors.

The record clearly establishes that no person was selected or excluded by reason of age, sex, occupation, political affiliation or lack thereof, geography of resi-

dence, economic status, race, religion, creed or other cognizable group criteria.

Defendants make much of the fact that those of the 7,700 who indicated on cards mailed to them that they were "too old to serve," suffering from some medical disability or indicated a "critical occupation" were not included in the 3,300. Defendants made no effort to establish the number so excluded and they have produced no evidence that would tend to prove that the jury panel did not, in fact, represent a fair cross-section of the inhabitants of the county. There was no evidence offered to show that any legally cognizable group was intentionally and systematically excluded.

There being no challenge to the selection of the 7,700 and there being not the slightest evidence offered that the selection or exclusion of any of the 7,700 to make up the 3,300 which went into the wheel involved any intentional and systematic exclusion of any cognizable group or for that matter, any negligent or inadvertent exclusion of any such group, we see no basis for sustaining the challenge to the array.

The record established that some suffering from a similar physical condition who did not indicate same would be included. Those in the same occupation who did not define it as being "critical" would also be included. Those with 10 children under the age of 12 who did not indicate that care of the children was a problem were included. NO COGNIZABLE GROUP was excluded either intentionally or inadvertently.

As was stated by the court in a comprehensive opinion by Judge Acker in the case of Commonwealth v. Webster, 53 D. & C. 2d 90, 96 (1971):

"The burden is upon the complaining party to establish the facts to support the challenge: Commonwealth v. Lopinson, 427 Pa. 284, 293, 234 A. 2d 552 (1967), 392 U.S. 647, 20 L. Ed. 2d 1344, 88 S. Ct. 2277.

There is a heavy burden upon the petitioner to show that a public official did not properly perform: Commonwealth v. McSorley, 189 Pa. Superior Ct. 223, 150 A. 2d 570 (1959). A court cannot tell the jury commissioners how to discharge their statutory duties in selecting grand jurors and there is a presumption that they perform their public duty in a lawful manner: United States v. McClure, 4 Fed. Supp. 668 (1933). *If the act has been substantially complied with without a question of fraud or concealment, it is proper to deny a motion to quash the array of the grand jury:* Klemmer v. Mount Penn Gravity R.R. Co., 163 Pa. 521, 30 Atl. 274 (1894); Commonwealth v. Valsalka, 181 Pa. 17, 37 Atlantic 405 (1897)." (Italics supplied.)

After the 7,700 names were selected, each such person was mailed a two-part card, one of which was to be returned to the jury commissioners. The information called for was name, address, occupation, age, birth date, voting district, telephone, previous jury service, party affiliation — Democrat, Republican, Constitutional or Other, and the answer to the question "If you have illness or condition which affects your ability to serve — Please explain."

Some persons were excluded from the 3,300 because they indicated an illness or condition which would affect their ability to serve or indicated they were in a "critical occupation" or considered themselves "too old to serve."

However, there was not an iota of evidence produced that any of those selected for the 3,300 prospective jurors or that those called for service at the October 30th grand jury were not sober, intelligent and judicious persons. Nor was there a scintilla of evidence produced that either the 7,700 or the 3,300 were not a fair cross-section of the county's population.

Although the jury selection act was enacted in 1867,

this is 1972. The population of Beaver County does exceed 200,000. The number of registered voters does exceed 90,000. Practical considerations are relevant in determination of the reasonableness of methods: Dow v. Carnegie-Illinois Steel Corp., 224 F. 2d 414 (3d Cir., 1955).

To paraphrase the court in the Webster case, supra, the day has long passed, if it ever existed, where jury commissioners in a county of more than 200,000 persons with over 90,000 registered voters can possibly know by personal knowledge whether the 90,000 plus registered voters are, in fact, sober, intelligent and judicious without an adequate staff (commissioners are authorized to employ one clerk) or resources or the power to subpoena persons to come and answer questions truthfully. This court and the jury commissioners arrived at a solution which was the most fair and practical.

*Must the array of the grand jury be quashed because some of the 7,700 excluded from the 3,300 which went into the wheel probably were just as qualified and eligible to serve as those included in the 3,300?*

If any of the more than 90,000 registered electors could have been selected and if any of the 7,700 could have been selected, does it matter that some were excluded who may have been properly included *absent any evidence* that exclusions resulted in the exclusion of any cognizable group intentionally and systematically or even by negligence or inadvertence? We think not: Grimes v. United States, 391 F. 2d 709 (1968); United States v. Butera, 420 F. 2d 564 (1970); United States v. Kelly, 349 F. 2d 720 (1965); United States v. Gast, 457 F. 2d 141 (1972).

In the instant case, it would appear that most of the 7,700 who were not included in the 3,300 placed in the wheel were not included by reason of the fact

that they did not return their cards, or, at least, did not return them in time for the selection. In the case of United States v. Hyde, 448 F. 2d 815 (1971), the court held that the possibility that Negroes and women to whom prospective juror questionnaires were sent may have failed in disproportionate numbers to return such questionnaires did not require the conclusion that jurors were discriminately selected. In this case, unlike the Hyde case, there was no evidence to show a complete absence or "spectacular" underrepresentation of any group.

In the case of Swain v. Alabama, 380 U.S. 202, 85 S. Ct. 824 (1965), the court held that purposeful discrimination may not be assumed or merely asserted but must be proven.

Giving defendants the benefit of all doubts, the sum and substance of the challenge is that some qualified electors were not included without any effort to show that: (1) those included were not qualified; (2) not a representative cross-section of the community; or (3) the exclusions were based on some identifiable group criteria. The exclusion of those who consider themselves too old or too ill to serve and those who consider themselves engaged in "critical" occupations when it is clear that others of the same age, suffering the same illnesses or engaged in the same "critical occupations" did not "disqualify" themselves and were included does not constitute an improper selection of jurors so as to be sufficient grounds for a successful challenge to the array of the herein grand jury. The rule requires that a successful challenge must show that the selection was not *substantially* in accordance with law.

There was no effort to establish the number who "disqualified" themselves. We must conclude that the number was not significant and de minimis, in any event. Those same persons, if included and later sum-

moned, would, in most cases, be excused from actual service upon a proper request to a judge of this court. Those beyond the 3,300 who were coded as being available were "returned" to the computer for possible selection in ensuing years, together with all other electors.

We conclude that the grand jury convened on October 30, 1972, was selected, drawn and summoned substantially in accordance with law: Act of April 10, 1867, P. L. 2, sec. 2, 17 PS §942.

Defendants seek to make much of the role of the clerk to the jury commissioners. Her testimony was that if a card from a prospective juror showed no problem on its face but merely the information requested, she automatically included all such persons as being available for jury service, and all in accordance with the system adopted by the court *and the jury commissioners*. (The testimony of the clerk is not clear as to whether she excluded all physicians and policemen or only those who asked to be excluded because of their occupations).

The array will be quashed, if the actual selection is made in any degree by others, or if in making the selection the jury commissioners submit their discretion to the guidance of others; *but not if the lists are made up by the commissioners from proper persons and on their own judgment, though on information furnished by others:* Commonwealth v. Baranowski, 5 Pa. C.C. 642 (1888); Klemmer v. Mount Penn Gravity R.R. Co., 163 Pa. 521 (1894); Bucks County Jurors, 20 Pa. C.C. 36 (1897).

In the instant case, the jury commissioners and the President Judge determined that the list would be obtained by having the computer select the names from the voter registration lists.

In the case of Commonwealth v. Carroll, 443 Pa.

518 (1971), our Supreme Court, quoting from Mr. Justice Frankfurter's concurring opinion in Cassell v. Texas, 339 U. S. 282, set forth:

"The United States Constitution does not permit a token, nor require a proportioned representation of the various *identifiable groups of the community* in a jury panel. The composition of the jury panel must be the product of either 'operation of an honest exercise of relevant judgment or the uncontrolled caprices of chance.'" (Italics supplied.)

Essentially, the composition of the jury panel in Beaver County in 1972 was the product of the uncontrolled caprices of chance. The 7,700 persons originally selected from which the 3,300 were ultimately placed in the jury wheel resulted from a computer selecting every twelfth name on the voter registration lists. To the extent that the selection process was not by chance, there was an honest exercise of relevant judgment. Therefore, the constitutional challenge must fail.

Defendants have cited a number of cases in support of their contentions. None of them are analogous: Ballard v. United States, 329 U.S. 187, 67 S. Ct. 261 (1946), systematic exclusion of women; United States v. Zirpolo, 450 F. 2d 424 (3rd Cir., 1971), favored males over females in 2 to 1 ratio; Norris v. Alabama, 294 U.S. 587, 55 S. Ct. 579 (1935), exclusion of Negroes; Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S. Ct. 984 (1946), systematic and deliberate exclusion of *all* daily wage earners.

Defendants cite Avery v. Georgia, 345 U.S. 559, for the proposition that a jury selection system may be invalid on the theory that there was a potential for abuse even though such abuse cannot be shown. However, the facts in the Avery case were the use of different colored tickets being used depending upon the prospective juror's race. Obviously, the "potential"

for abuse involved the potential for total or substantial exclusion of an identifiable group. There is nothing like that in the instant case.

In the case of United States v. Guzman, 337 F. Supp. 140 (1972), the court defined a cognizable group:

"A group to be 'cognizable' for the present purposes must have a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace."

Defendants also stress that courts disfavor any system where jury commissioners are able to invoke their "subjective judgment" rather than objective criteria. There is nothing subjective about permanent blindness, permanent hearing defect, permanently bedridden, giving birth to a child, scheduled operation or obligations to care for young children or a disabled relative where no substitute is readily available.

In conclusion, we hold that under the applicable laws and rules of procedure in Pennsylvania the selection process to be infirm must involve selection not substantially in accordance with law; that is, selection other than from the whole qualified electors of sober, intelligent and judicious persons. The process

here challenged involved precisely what is required. We also conclude that defendants have not been denied the equal protection of the law.

## ORDER

Now, November 30, 1972, for the reasons stated in the foregoing opinion, it is ordered that defendants' challenge to the array of the grand jury convened on October 30, 1972, be, and it is hereby, rejected. Exception noted to defendants.