## Commonwealth v. Garcia

*Joseph Murray*, Assistant District Attorney for Commonwealth.

*Rudolph Pallastrome*, for defendant.

ANDERSON, J., January 8, 1974.—Petitioner, Juan Santa Garcia, was arrested and charged with a murder and rape that occurred in the City of Philadelphia on June 27, 1973. Subsequent to being held over for the action of the grand jury, but prior to indictment, counsel filed a petition to quash the array of the grand jury.[1] A hearing on the motion was held before the

---

[1] On November 6, 1973, an amendment to article I, sec. 10, of the Constitution of the Commonwealth of Pennsylvania was approved by the electorate. It authorized the courts of common pleas to provide for the initiation of criminal proceedings by information. Pursuant thereto, the Hon. D. Donald Jamieson, President Judge of the Court of Common Pleas of Philadelphia County, petitioned the Pennsylvania Supreme Court to approve the replacement of the system of indictment by grand jury in the First Judicial District of Pennsylvania, with a system of initiation of criminal proceedings by information of the district attorney, effective January 1, 1974. Said petition was granted per curiam, on December 17, 1973.

Notwithstanding the above, this court deems it necessary to

undersigned on September 24, 1973. Petitioner, who is of Puerto Rican heritage, asserts that the grand jury is without power to indict him because the persons in Philadelphia who were charged with the selection of grand jury venires in 1972 used standards for such selection which were vague and legally impermissible. Petitioner further contends that there is practiced systematic exclusion of persons of Spanish heritage which is evidenced by the underrepresentation of such persons on the grand juries, and that such underrepresentation is caused by two factors: (1) utilization by the jury commissioners of a source of prospective jurors which does not produce a cross-section of the community; namely, voter registration lists; and (2) the utilization of selection criteria which are vague, discretionary and not authorized by statute.

## JURY SELECTION PROCEDURE

Petitioner called as a witness Charles E. O'Connor, Esq., Assistant Clerk of the Jury Selection Board. Mr. O'Connor testified that, pursuant to statute,[2] in January 1973, the Jury Selection Board was supplied by

decide the instant matter for two reasons. Although the Supreme Court has granted the petition praying for the abolition of the grand jury, it is nevertheless understood that the procedure of indictment by grand jury will continue pending disposition of a test case challenging the constitutionality of the November 6th amendment. More important, however, is the fact that the same procedures are used in the selection of grand and petit juries. Therefore, the arguments asserted by the petitioner in his challenge to the array of the grand jury are equally applicable to a challenge to the array of the petit jury.

[2] Jury selection provisions for the City of Philadelphia are found at Act of March 31, 1843, P. L. 122, 17 PS §§1231-48. Provisions for counties of the first class are found at 17 PS §§1251-61. If a conflict exists between the two codes, provisions for first class counties control. See the Act of May 10, 1949, P. L. 1066, sec. 1, 17 PS §1251 (historical).

the Registration Commission with a list of the registered voters of the City of Philadelphia for the previous year. At a meeting with the Hon. Samuel H. Rosenberg, Secretary of the Jury Selection Board, it was determined that 90,000 questionnaires should be sent out in order to obtain a sufficiently large jury venire for the year. That number represents approximately one out of every 12 registered electors in the city of Philadelphia. Slips were made up, numbered one to 12, and placed in a box. Judge Rosenberg drew number 11. The actual selection was then made by computer. Starting with the eleventh name of an alphabetical list of registered voters, the computer was programmed to select every twelfth name. The computer then identified the selected names by ward and mechanically addressed questionnaires. Of the 90,000 questionnaires mailed, approximately 81,000 were returned. Of the latter, 28,000 names were ultimately placed in the jury wheels, and grand jurors were randomly selected from this group. The process by which 53,000 potential jurors was eliminated is alleged to be not in accordance with statute and the source of unconstitutional ethnic discrimination.

The statutory qualifications for jury duty in Philadelphia County are found in the Act of May 10, 1949, P. L. 1066, sec. 2, 17 PS §1252(c). That section required that jurors be registered electors who can read, write, speak and understand the English language; that they be physically and mentally capable of rendering efficient jury service; and that they be of good moral character and have never been convicted of a crime involving moral turpitude. Section 1252(b) delegates to the selection board, its members and masters appointed by the court of common pleas, the determination of qualifications by use of questionnaires, personal interviews or otherwise. Section 9 of the act,

17 PS §1259, provides for a three-year exemption to any citizen who has served on a jury. In addition, telegraph operators are exempted from service by the Act of April 8, 1862, P. L. 325, sec. 1, 17 PS §1102.[3] Thus, there are five criteria for exclusion from jury service: (1) failure to register; (2) illiteracy; (3) physical or mental incapacity; (4) poor character; and (5) conviction of a crime involving moral turpitude; and there are two reasons for exemption: (1) prior service; and (2) occupation as a telegraph operator.

The questionnaire which is sent to prospective jurors by the jury commission includes questions pertaining to occupation and employer; ability to read, write, speak and understand English, and the extent of education; criminal convictions; and prior jury service. The questionnaire also inquires whether there is any reason why the prospective juror cannot serve.

Upon receipt of the questionnaires, the jury masters immediately approve those which are complete on their face, and do not indicate an impediment to service. In 1973, between six and seven thousand persons were called in for interviews if their questionnaires were not complete, or if clarification was required. The remaining questionnaires were evaluated by use of certain guidelines promulgated by the late Vincent A. Carroll, Judge of the Court of Common Pleas of Philadelphia County. Judge Carroll's coding system details reasons why an individual would not be called for jury duty and is as follows:

R-1—Out of jurisdiction
R-2—Deceased
R-3—Physically and mentally unfit
R-4—Educationally unfit
R-5—Criminal record

---

[3] Renumbered from 15 PS §2461.

R-6—Jury exemption, if claimed
R-7—City, State and Federal employe
R-8—Military service
R-9—Miscellaneous

These nine categories include three specific sub-groups: *exclusions*—exception from service by reason of a failure to meet statutory requirements; *exemptions*—immunity from service by reason of a statutory exception; *excuses*—exception from service by reason of individual request.

R-6 represents the statutory exemption, and is not challenged by petitioner. Likewise, the exclusions encompassed by R-1, R-2 and R-3 are not being challenged by petitioner because they represent objective criteria.

However, there is a certain amount of discretion exercised by the jury masters in the determination of exclusions encompassed in R-4 and R-5. Mr. O'Connor, who also serves as a jury master, testified that in determining educational qualifications, an individual who indicates on the questionnaire that he can read, write, speak and understand English may still be disqualified if he also indicates that he has not completed a grade school education. However, he added that very few persons are disqualified on the basis of R-4.

To be eligible for jury duty, an individual must be of good moral character and must not have been convicted of a crime involving moral turpitude. The latter term is defined as "[c]onduct contrary to justice, honesty, modesty, or good morals": Black's Law Dictionary, page 1160 (4th Ed. 1951). Mr. O'Connor indicated that persons convicted of felonies and persons who have extensive arrest records are excluded. However, he added that he considers all circum-

stances, and that old convictions or contempt of family court proceedings may be entirely discounted.

It is beyond argument that the State may prescribe relevant qualifications for prospective jurors: Carter v. Jury Commission of Greene County, 396 U. S. 320, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970); Brown v. Allen, 344 U. S. 443, 73 S. Ct. 397, 97 L. Ed. 469 (1953); Cassell v. Texas, 339 U. S. 282, 70 S. Ct. 629, 94 L. Ed. 839 (1950). Moreover, a jury selection process is not rendered invalid because it allows the exercise of judgment or a wide range of discretion by those charged with implementing it: (Franklin v. South Carolina, 218 U. S. 161, 30 S. Ct. 640, 54 L. Ed. 980 (1910); Smith v. Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84 (1940)); or because the standards used are not mathematically precise [requirements that jurors be "upright" and "intelligent" were upheld in Turner v. Fouche, 396 U. S. 346, 354, 90 S. Ct. 532, 24 L. Ed. 2d 567, 575 (1970)]. All that is required is that the qualifications be relevant and the determinations be made in good faith and in a nondiscriminatory manner.

In the instant case, there was absolutely no evidence produced at the hearing to indicate that discretion was exercised by the jury masters in the disqualification of prospective jurors in a manner that was anything but reasonable and impartial.

A more complicated problem is involved in the grant of excuses under R-7 (government workers), R-8 (persons in the military), and especially R-9. R-9 encompasses self-employed and public service employes (clergy, judges, doctors, lawyers, nurses, teachers); key men in businesses (one-man barber shops); persons over the age of 70; and women with small children. Release from service under these three excuse categories arises solely out of an affirmative

request on the part of the prospective juror and is not automatic.

Petitioner contends that the jury masters are without authority to grant any excuses. With this contention, we do not agree.

The Act of March 31, 1870, P. L. 732, sec. 1, 17 PS §1247, provides:

"No person shall be *exempt* from serving as a juror in any of the courts of the city and county of Philadelphia unless he shall have filed an affidavit, setting forth the ground for such exemption, with the clerk of the board for selecting and drawing jurors, prior to the first day of July in the year next preceding that for which he shall claim exemption; any such affidavit, when filed, shall be submitted to a judge of one of said courts, and if it shall set forth *good and sufficient grounds* for exemption, the name of such person shall not be placed in the wheel containing the names of jurors for the next succeeding year: Provided, however, That it shall be at the discretion of the judge or judges holding any court in said county to *excuse* from service any person summoned as a juror, on application in open court, and good and satisfactory cause shown." (Italics supplied.)

While we have previously made reference to the important distinctions between the terms "excuse" and "exemption," in the context of section 1247, these two terms are synonymous and encompass both meanings previously discussed. It would be a needlessly broad use of language if "good and sufficient grounds" for an exemption referred to grounds solely statutory in nature.

Any other reading of this section would leave Philadelphia County without a means of excusing persons for hardship reasons until after the hardship had actually been imposed. Moreover, such a construction

runs counter to the statutory scheme provided for certain other counties in Pennsylvania, which specifically provides for categories of excuses.[4] Compare Rabinowitz v. United States, 366 F. 2d 34 (5th Cir., 1966), and the Federal jury selection scheme described therein.

The substitution of signed questionnaires for affidavits; the use by the jury masters of standards promulgated by Judge Carroll; and especially the presence of Judge Rosenberg on the jury selection board represents substantial compliance with section 1247.

The granting of an excuse is not, in and of itself, unlawful. Cf. Clark v. Ellenbogen, 319 F. Supp. 623 (W. D. Pa., 1970). As has been previously discussed, the exercise of judgment or a wide range of discretion is permissible. It is only when the categories of excuses on their face indicate the exclusion of a particular group that they are unlawful. In Thiel v. Southern Pacific Co., 328 U. S. 217, 66 S. Ct. 984, 90 L. Ed. 1181 (1946), the United States Supreme Court held that the practice utilized by California jury commissioners in excluding all daily wage earners from jury duty because of hardship, since they were invariably excused by a judge after summoning, impermissibly

---

[4] See Act of May 11, 1925, P. L. 561, sec. 9, as amended, 17 PS §1279, relating to counties of the second class, which allows *excuses* to druggists, undertakers, ministers, members of religious orders and persons who have performed duty in the Pennsylvania National Guard for a period of nine years, or who have served for nine months or longer in active military service. The section also provides for excuses to persons who "cannot serve without great hardship, loss, or serious inconvenience to such persons or his or their family or families."

In addition, attorneys, physicians and professional nurses in active practice; school teachers; employes of any municipal police or fire department; and county, State and Federal employes are *exempt* from jury service.

resulted in discrimination against persons of low economic and social status. Similarly, it is unconstitutional for a universally applied excuse to be used as a subterfuge for the exclusion of a particular group. In Labat v. Bennett, 365 F. 2d 698 (5th Cir., 1966), cert. denied 386 U. S. 991, 87 S. Ct. 1303, 18 L. Ed. 2d 334 (1967), the grant of an automatic excuse to all day laborers, e.g., persons not on salary, resulted in the impermissible elimination of 47 percent of the Negro males in New Orleans Parish who were otherwise eligible for service on juries.

In the instant case, the excuses recognized in R-7, R-8, and R-9 are similar to those statutorily provided for in Pennsylvania counties of the second class. They have a bearing on the participation of men and women, blue collar and white collar workers, rich and poor, educated and uneducated. Because they are so varied they do not, on their face, discriminate against any identifiable segment of the population.

Actual discrimination against any group or groups, including persons of Spanish heritage, will be discussed below.

## INVIDIOUS DISCRIMINATION

Petitioner asserts that there exists in the selection of grand jurors in the City of Philadelphia, invidious discrimination against persons of Spanish heritage through the use of voter registration lists as a source of prospective jurors and by use of the aforementioned "vague and impermissible standards for the granting of excuses from jury service."

The American system of justice contemplates the use of a jury which represents a cross-section of the community: Smith v. Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84 (1940). However, obtaining a cross-section of the community does not require that the

jury or the venire "be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group": Swain v. Alabama, 380 U. S. 202, 208, 85 S. Ct. 824, 13 L. Ed. 2d 759, 766 (1965); Commonwealth v. Carroll, 443 Pa. 518, 523 (1971). In Thiel v. Southern Pacific Co., 328 U. S. 217, 220, 66 S. Ct. 984, 90 L. Ed. 1181, 1185 (1946), the Supreme Court held that cross-sectional representation "does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community."

In Commonwealth v. Jones, 452 Pa. 299 (1973), a case involving allegations of racial discrimination in the selection of a petit jury, our court summarized the applicable law:

"It is clear that a defendant has no right to demand that members of his race be on the jury which tries him, however, he does have a right to require a state not to deliberately and systematically exclude members of his race from the jury panels and from the juries ultimately drawn from those panels, consequently, he must prove systematic exclusion, thereby demonstrating a violation of the Equal Protection Clause. Moreover, a defendant may not demand proportionate numbers of his race on the jury which tries him, or on the panel from which the jury is selected, but he does have a right to a jury drawn from a panel which represents a cross-section of the community. The defendant has the initial burden of demonstrating a prima facie case of discrimination, then the burden shifts to the Commonwealth to rebut the evidence, if the Commonwealth fails, the selection system does not meet the requisite constitutional standards and the defendant is entitled to another jury,

selected under a system which complies with the constitutional mandate." Id. at 311.

In the instant case, petitioner asserts that in order to establish a prima facie case of invidious discrimination, he need only prove that there exists a substantial disparity between the number of persons of Spanish heritage called for jury duty and the proportion of such persons in the general population; and that the selection process affords an opportunity to discriminate.[5] Accord: Smith v. Yeager, 465 F. 2d 272 (3d Cir., 1972), cert. denied 409 U. S. 1076 (1972); Commonwealth v. Locke, C. P. Phila. Co., MC 70-09-1190, October term, 1970, misc. no. 70-10-2476, issued October 31, 1972.

However, the Commonwealth correctly contends that more is necessary to establish a prima facie case. First, the petitioner must establish that the persons who are the object of the alleged discrimination constitute a cognizable group in the community: Hernandez v. Texas, 347 U. S. 475, 74 S. Ct. 667, 98 L. Ed. 866 (1954). Secondly, the holdings of the United States Supreme Court in several cases indicate that in order to establish a prima facie case, it is necessary to establish the existence of a nexus between the substantial disparity and the opportunity to discriminate. That is, the substantial disparity must arise at the point in the selection process where the opportunity to discriminate exists, e.g., where the masters exercise discretion.

---

[5] Several other methods of establishing a prima facie case of systematic exclusion exist, but are not applicable here:

1. Proof of intentional, purposeful exclusion: Strauder v. Virginia, 100 U. S. 303, 25 L. Ed. 664 (1880).

2. A pattern of total exclusion over a period of years: Norris v. Alabama, 294 U. S. 587, 79 L. Ed. 1074 (1935).

3. A pattern of token inclusion over a period of years: Avery v. Georgia, 345 U. S. 559, 73 S. Ct. 891, 97 L. Ed. 1244 (1953).

## ASCERTAINABLE GROUP

In numerous decisions, the Supreme Court of the United States has held that it is a denial of equal protection of the law to try a defendant under an indictment of a grand jury or before a petit jury from which all persons of his race have been excluded. See, i.e., Carter v. Texas, 177 U. S. 442, 44 L. Ed. 839 (1900). In Ballard v. United States, 329 U. S. 187, 67 S. Ct. 261, 91 L. Ed. 181 (1946), the court held that an individual may challenge the exclusion of a group from jury rolls, even though he is not a member of the group excluded.

Although most cases arise in relation to discrimination against Negroes, in Hernandez v. Texas, 347 U. S. 475, 98 L. Ed. 866 (1953), the court applied the Equal Protection Clause in a Texas case involving discrimination in jury selection against persons of Mexican descent. In that case, the court required demonstration of the existence of a distinct class:

"Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. *When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification,* the guarantees of the Constitution have been violated." (Italics supplied.) Id. at 478, 98 L. Ed. at 870.

This requirement was reiterated in Swain v. Alabama, 380 U. S. 202, 205, 13 L. Ed. 2d 759, 764 (1965), where the court said that the "constitutional command forbidding intentional exclusion . . . applies

to any identifiable group in the community which may be the subject of prejudice." In United States ex rel. Leguillou v. Davis, 115 F. Supp. 392 (D. C. V. I, 1953), the district court held that in St. Croix, persons of Puerto Rican heritage who represented 28 percent of the population of the island, constituted a minority group that was the object of prejudice.

In the instant case, petitioner is of Puerto Rican descent. He asserts that persons of Spanish heritage are the object of discrimination. The Commonwealth, on the other hand, contends that if an identifiable group exists, it is limited to persons of Puerto Rican descent. No evidence was presented to support either of these positions, nor was any evidence presented tending to show that either group is the subject of prejudice in the Philadelphia community.

This requirement is very necessary in cases dealing with allegations of discrimination because of race, religion or national origin, because it serves to eliminate totally frivolous claims at the outset. For instance, although no names appear on the grand jury lists for 1972 which are Oriental or Scandinavian sounding, it would be absurd to claim that the absence of such persons was due to intentional discrimination.

However, for purposes of this case, this court will take judicial notice of the fact that Puerto Ricans and Spanish-speaking people in general may be the object of discriminatory practices, although such practices are most likely to be based on language deficiencies rather than ethnic bias.[6]

---

[6] See The Sunday Bulletin, Sunday, December 9, 1973, sec. 1, page 11, where it was reported that the U. S. Department of Health, Education and Welfare had accused eight Philadelphia hospitals of discriminating against Puerto Ricans in employment practices or patient care. The gravamen of the complaints was the lack of sufficient personnel capable of communicating with Spanish-speaking persons.

Petitioner offered into evidence certain statistics and terms used by the United States Department of Commerce in the compilation of the 1970 census.[7]

There are 1,948,609[8] persons in Philadelphia. Of that number 45, 798[9] are persons of Spanish language.[10] This group is further broken down into two subgroups which are *not* mutually exclusive: 36,543[11] are persons of Spanish mother tongue,[12] and 26,702[13] are persons of Puerto Rican origin or descent.[14] Therefore, approximately 58 percent of persons of Spanish language are also of Puerto Rican origin or descent.

---

[7] Because some of the figures cited by petitioner are only approximations, for the sake of clarity and complete accuracy, this court will take judicial notice of the statistics as they actually appear in the 1970 Census of Population and Housing, Census Tracts, Phila., Pa.-N.J. U. S. Dept. Commerce Pub., May 1972 [hereinafter cited as 1970 Census-Population and Housing] , and 1970 Census of Population, General Social and Economic Characteristics, Pa. U. S. Dept. Commerce Pub., May 1972 [hereinafter cited as 1970 Census—General Social and Economic Characteristics] ; see Pa. Law Encyclopedia, Evidence, §1, p. 282; Pittsburgh Railways Company v. Public Service Commission, 124 Pa. Superior Ct. 266, 269 (1936).

[8] 1970 Census-Population and Housing Table P-2, page 2.

[9] Id., page 79.

[10] Spanish language class is comprised of: (1) Persons of Spanish mother tongue (language spoken in person's home when he was a child); and (2) all other persons in families in which the head or wife reported Spanish as his or her mother tongue: 1970 Census-Population and Housing, Appendix B, App.-4.

[11] 1970 Census—Population and Housing, Table P-2, page 79.

[12] See note 3, supra.

[13] 1970 Census—Population and Housing, Table P-2, page 79.

[14] Puerto Rican birth or parentage includes persons born in Puerto Rico and persons born in the United States or outlying areas with one or both parents born in Puerto Rico: 1970 Census —Population and Housing, Appendix B, App.-4.

It is relevant that specific statistics for the Puerto Rican population are given, in addition to statistics for Spanish language persons in general. Even more relevant, however, is the fact that two minority groups were selected for in-depth study relative to housing, employment, education, etc.: Negroes and Puerto Ricans.[15] Clearly, identity of language was not considered a sufficient reason for evaluating all Spanish-speaking persons as one group, since those persons may have family origins in many different places in the world, i.e., Cuba, Mexico, South America, Spain. While not deciding the issue, for purposes of ruling on this petition, persons of Puerto Rican heritage will be assumed to constitute an identifiable class.

## SUBSTANTIAL DISPARITY

In order to establish a prima facie case of discrimination, it is necessary to establish a substantial disparity between the proportion of persons of the group in question who are available for jury duty, and their proportion on the jury venire.

Petitioner asserts that of the 425 persons who constituted grand juries in 1972, only 2, or .47 percent have Spanish sounding surnames. Although, at first glance this low figure appears significant, a comparison with the percentage of either Spanish-speaking or Puerto Rican persons in the population, shows that no significant disparity exists.

Persons of Spanish language (45,798), comprise 2.3 percent of the population; and persons of Puerto Rican descent (26,702), comprise only 1.3 percent of the population. This latter figure, does not, however,

---

[15] See generally, 1970 Census—General Social and Economic Characteristics.

represent the number of persons who were eligible to vote, because it includes persons under the age of 18. Of the total population of Philadelphia (1,948,609), 607,266,[16] or 31 percent are under the age of 18. The Puerto Rican population has a much higher proportion of young people. In 1970, 14,529,[17] or 54 percent of the Puerto Rican population was under the age of 18. Therefore, Puerto Ricans constituted only .91 percent of the eligible voters in the City of Philadelphia.[18]

The disparity between .47 percent and .91 percent is insignificant. Even if 2.3 percent is used as a base, the difference is equally insignificant, and does not begin to approach the disparities condemned in previous cases.[19]

## OPPORTUNITY TO DISCRIMINATE

Initially, defendant asserts that the use of voter registration lists as a source of prospective jurors is impermissible because such a procedure eliminates from service all persons who fail to register to vote. Petitioner's argument is without merit. Persons who fail to register to vote have never been considered to

---

[16] 1970 Census—Population and Housing, Table P-1, page 2.

[17] 1970 Census—General Social and Economic Characteristics, Table 97, page 40-488.

[18] $$\frac{12,173}{1,341,343} = .0091 = .91 \text{ percent}$$

[19] Alexander v. Louisiana, 405 U. S. 625, 92 S. Ct. 1221, 31 L.Ed. 2d 536 (1972) (disparity 19 percent); Turner v. Fouche, 396 U. S. 346, 90 S. Ct. 532, 24 L. Ed. 2d 567 (1970) (disparity 23 percent); Carter v. Jury Commission of Greene County, 396 U. S. 320, 90 S. Ct. 518, 24 L. Ed. 2d 549 (1970) (disparity 33 percent); Smith v. Yeager, 465 F. 2d 272 (3d Cir., 1972) (disparity 19 percent).

No prima facie case was established in Coleman v. Alabama, 389 U. S. 22, 88 S. Ct. 2, 19 L. Ed. 2d 22 (1967) (disparity 11-16 percent); Swain v. Alabama, 380 U. S. 202, 13 L. Ed. 2d 759 (1965) (disparity 11-16 percent); Rodriguez v. Brown, 429 F. 2d 269 (5th Cir., 1970) (disparity of 1.5 percent).

constitute a "cognizable group," and it is the exclusion of such a group which is unlawful: Grimes v. United States, 391 F. 2d 709 (5th Cir., 1968), cert. denied 393 U. S. 825, 89 S. Ct. 87, 21 L. Ed. 2d 96 (1968). In United States v. Parker, 428 F. 2d 488 (9th Cir., 1970), the court held that the use of voter lists as a sole source of names of jurors is not constitutionally invalid, absent a showing of discrimination in compiling such voter registration lists.

In United States v. Tillman, 272 F. Supp. 908, 915, n.10 (N.D. Ga., 1967), the court said:

"[T]he best thought of all three branches of government points toward voter registration lists as representing 'the best cross-section of the community; indeed, they are probably the most broadly based lists available.'"

Similarly, in Simmons v. United States, 406 F. 2d 456, 463 (5th Cir., 1969), it was said that:

"No significant improvement in our nation's federal judicial machinery has ever met such unanimity of opinion as to its importance and propriety as has adoption by the Congress of the system of jury selection at random from voter registration lists."

See also United States v. Gast, 457 F. 2d 141 (7th Cir., 1972), cert. denied 406 U. S. 969, 92 S. Ct. 2426, 32 L. Ed. 2d 668 (1972), and cases cited at page 142. Contra: Smith v. Yeager, 465 F. 2d 272, 278, n.15 (3d Cir., 1972) (dictum), cert. denied 409 U. S. 1076 (1972).

No doubt, sources of names can be found which will increase the pool of prospective jurors, i.e., telephone directories,[20] church lists, club lists. However, Philadephia, with its population of almost

---

[20] A special problem exists with the use of telephone directories as an added source of names, because women are greatly underrepresented and poor persons who do not have a telephone are excluded entirely.

2,000,000, is a "melting pot"; its citizens have ancestral roots in all corners of the globe, and represent a myriad of social, religious and language groups. Consideration of ancestry by countries or ancestral language would multiply the number of classes beyond all reason. Voter registration lists constitute so great a pool, that their use as the source of prospective jurors will automatically approximate the multi-group character of the city.

Petitioner did not attempt to show discrimination in the compilation of voter registration lists. In the opinion of the court, the use in Philadelphia County of such lists as the sole source of jurors was lawful.

Petitioner further asserts that the opportunity to discriminate in the selection of the venire from which grand jurors are selected, exists through the use of vague and legally impermissible standards for the granting of excuses from jury service. As has been discussed below, the criteria used in excusing prospective jurors is neither vague nor impermissible. However, because the grant of excuses and certain exclusions involves the exercise of discretion by the jury masters, the opportunity to discriminate does exist.

However, proof of opportunity is not enough. Petitioner has one additional burden; he must demonstrate that any disparity which exists bears a nexus to this exercise of discretion.

In Turner v. Fouche, 396 U. S. 346, 360, 24 L. Ed. 2d 567, 579 (1970), the Supreme Court said:

"In sum, the appellants demonstrated a substantial disparity between the percentages of Negro residents in the county as a whole and of Negroes on the newly constituted jury list. *They further demonstrated that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment*

*rather than objective criteria.* The appellants thereby made out a prima facie case of jury discrimination, and the burden fell on the appellees to overcome it." (Italics supplied.)

See also, Patton v. Mississippi, 332 U. S. 463, 68 S. Ct. 184, 92 L. Ed. 76 (1947).

Even though the nexus requirement may not be specifically articulated, it is invariably applied. See, i.e., United States ex rel. Seals v. Wiman, 304 F. 2d 53 (5th Cir., 1962) (course of conduct of jury commissioners of Mobile County in relying on personal knowledge of good character of prospective jurors resulted in discrimination); Smith v. Yeager, 465 F. 2d 272 (3d Cir. 1972), cert. denied 409 U. S. 1076 (1972) (disparity identified with use of key man system).

Therefore, it was necessary for petitioner to prove that the jury masters actually discriminated in the selection of the jurors. This could be accomplished by direct proof, or by circumstantial evidence. Thus, if petitioner had provided evidence of the number of Puerto Ricans, or even persons with a Spanish-sounding name, who were registered to vote, and evidence that a substantial number of these persons were actually otherwise qualified to vote, then any disparity in the final choice of veniremen could be attributed by inference to the discretion exercised by the jury masters. See, i.e., Alexander v. Louisiana, 405 U. S. 625, 87 S. Ct. 643, 31 L. Ed. 2d 536 (1972); Whitus v. Georgia, 385 U. S. 545, 17 L. Ed. 2d 599 (1967). However, in the instant case, there was no such proof.

It should also be noted that 15,018[21] or 56 percent of persons of Puerto Rican descent in the City of Philadelphia are foreign born.

Given the fact that many Puerto Ricans are foreign

[21] 1970 Census—General Social and Economic Characteristics, Table 97, page 40-488.

born, and that as a group their chief social disability is the inability to communicate well in English,[22] this court, without specific proof, cannot hold that the insignificant disparity between the proportion of Puerto Ricans on the grand juries and the number of eligible Puerto Rican voters in the population, is the result of ethnic discrimination.

In Alexander v. Louisiana, 405 U. S. 625, 31 L. Ed. 2d 536 (1972), supra, the Supreme Court said:

"This Court has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors." Id. at 630, 31 L. Ed. 2d at 541-42.

Considering all the factors in this case, this court concludes that petitioner has failed to sustain the burden of proving a prima facie case of invidious ethnic discrimination. Accordingly, his motion to quash and dismiss the array of the grand jury must be dismissed.

### ORDER

And now, January 8, 1974, the motion of petitioner, Juan Santa Garcia, to quash and dismiss array of the grand jury is hereby dismissed.

[22] See note 6, supra.